ELIPHAS SPENCER, PLAINTIFF IN ERROR, *v.* JOHN W. LAPSLEY.

The judge of the District Court of the United States in Texas had power to order the record of a suit in which he was interested to be transmitted to the Circuit Court of the United States in Louisiana.

A plea in abatement, filed in connection with pleas in bar, was irregular; and the refusal of the court below to allow the plea to be filed is not subject to the review of this court.

A contract for the sale of eleven leagues of land in Texas, issued before the revolution, and subsequently located within the colonizing grant of Austin and Williams, with their consent, and certified by the Secretary of State, was good without the signature of the Governor.

So far as the land was within the colonizing grant of Robertson, his consent was not necessary, the term of his grant having expired.

Where no organization of a colonial grant had taken place by the introduction of settlers, the land not occupied was open for public sale, with the consent of the empresario, and the alcalde was a proper person to put the purchaser in possession.

That the survey was made before the order of survey was directed to the surveyor, was not fatal to the grant. Any preliminary defects were cured by the patent. The fairness of the grant cannot be investigated at law, at the instance of a third party.

A power of attorney, authenticated before a regidor, proved by the handwriting of the regidor and the assisting witnesses, held sufficient.

This case was brought up, by writ of error, from the Circuit Court of the United States for the eastern district of Louisiana.

It was an action of trespass to try title, brought by Lapsley against Spencer, originating in the District Court of the United States for Texas, which sat at Galveston, thence removed to the District Court which sat at Austin, and thence removed to the Circuit Court of the United States for the eastern district of Louisiana.

The narrative of the facts of the case, and of the points which successively arose upon the trial, is fully given in the opinion of the court; and the statement of the points which were made by the counsel who argued the case in this court, renders it unnecessary for the reporter to repeat them.

It was argued by *Mr. Benjamin* for the plaintiff in error, and *Mr. Hughes* for the defendant, upon which side there was also a brief by *Mr. Hale.*

Mr. Justice CAMPBELL delivered the opinion of the court.

The defendant in error, Lapsley, commenced this suit in January, 1851, in the District Court of the United States for Texas, against the plaintiff in error, Spencer, to recover a parcel of land, and damages for the ouster he had suffered. At the April term of the court, 1851, the defendant appeared and demurred to the petition, assigning—1st. The description of the premises is insufficient. 2d. The citizenship of the parties is not specifically averred. 3d. There is no endorsement on the petition, as the statutes of Texas require.

With this demurrer, an answer containing pleas of not guilty, the statute of limitations, and that the plaintiff claims under a grant with conditions, and that the grant is fraudulent, and the conditions were not performed, was filed. Subsequently to the act of Congress of 3d March, 1851, (9 Stat. at L., ch. 32, sec. 6, p. 618,) this cause was transferred to the District Court of Texas, held at Austin. No order of the court appears for this transfer, and it is presumed it was done by consent. The defendants appeared to the cause at Austin, by attorney. At the November term of that court, in 1854, the following order was made by the District Court:

"This day came the plaintiff aforesaid, by his attorney, and on motion of said plaintiff, by his attorney, the judge now presiding states and enters upon the record that he ha an interest with the plaintiff in the land in controversy in this suit, which, in his opinion, renders it improper for him to sit in the trial of the same; and, thereupon, the court upon further motion orders, because there is no Circuit Court of the United States

in this State, that an authenticated copy of this order, and of all the record and proceedings in this action, be forthwith certified to the Circuit Court of the United States for the eastern district of the State of Louisiana, at New Orleans, that court being the most convenient of the United States Circuit Courts in adjoining States."

The authority to make this order is supposed to be derived from the act of Congress of the 3d March, 1821, (3 Stat. at L., ch. 51, p. 643,) which provides : "That in all suits and actions in any District Court of the United States, in which it shall appear that the judge of such court is any ways concerned in interest, or has been of counsel for either party, or is so related to, or connected with, either party, as to render it improper for him, in his opinion, to sit on the trial of such suit or action, it shall be the duty of such judge, on application of either party, to cause the fact to be entered on the records of the court." He was then required to order an authenticated copy of the record to be certified to the most convenient Circuit Court of an adjacent State ; which Circuit Court shall, upon such record being filed with the clerk thereof, "take cognizance thereof, in the like manner as if such suit or action had been originally commenced in that court, and shall proceed to hear and determine the same accordingly ; and the jurisdiction of such Circuit Court shall extend to all such cases, so removed, as were cognizable in the District Court from which the same was removed."

The record was filed in the Circuit Court in Louisiana, in April, 1855, and the cause was continued until the April term of 1856, before it came to trial. In April, 1856, the defendant moved to dismiss the cause: 1st. Because the record shows that the judge of the District Court for Texas, before the suit was brought, had an interest in the land in dispute. 2d. Said interest disqualified said judge from making an order in the cause. 3d. That his orders were void. 4th. That the Circuit Court at New Orleans had no jurisdiction.

It is quite unimportant to consider whether a judge can make any, and if any, what orders, in a suit in which he is interested. This was much discussed in the Grand Junction Canal Company *v.* Dimes, 12 Beav., 63; 3 H. L. Ca., 759. The act of Congress proceeds upon an acknowledgment of the maxim, "that a man should not be a judge in his own cause," and requires a judge found in that predicament, on the motion of either party, to make an order for the removal of the cause to another competent jurisdiction. No other order in this cause was made by the district judge, and he was not authorized to act under the statute, except on motion, and when the motion was made the order was entered. The entry on the

record by the judge imports verity, and his order authorized the Circuit Court at New Orleans to take cognizance of the cause.

The defendant obtained leave of the Circuit Court to amend his answer the third term after the transfer. In the amendment, after adding to his pleas in bar of the action, he pleaded that the apparent legal title was vested in the plaintiff by collusion between him and three other persons, who were citizens of Texas, (one of whom was the judge of the District Court,) to litigate and establish a fraudulent grant in that court, and that these persons were the only persons interested in the said grant. In so far as this statement contained any defence to the action, it was comprehended in pleas already on file. As a plea in abatement of the suit, it was open to the objections that it was pleaded, without an affidavit, five years after pleas in bar had been filed, and which were undisposed of, and that it was filed, in connection with other matter, in bar. Such pleading was contrary to the rule and practice of the courts, and was properly disallowed. (Shepperd *v.* Graves, 14 How., 505; Bailey *v.* Dozier, 6 How., 23; Drake *v.* Brander, 8 Tex., 351; Dallam —— ——, 590.)

The defendant then applied for leave to file a formal plea in abatement, containing the same allegations as those before stated; and with this plea the defendant propounded thirty-one interrogatories to the plaintiff, to obtain evidence for its support; and also filed an affidavit, to the effect that he had not discovered the facts pleaded at the time his plea of the general issue had been filed in 1851. But the defendant made no offer to withdraw his pleas in bar; nor did the affidavit show when or in what manner his discovery was made; nor why the application to file the plea and obtain the evidence had not been made at an earlier date; nor why it was delayed till a time when any allowance of it might operate a continuance, when the case had already been pending for a year in the Circuit Court. The Circuit Court denied the application. This court has decided that such applications are addressed to the judicial discretion of the inferior court, and its decision is not open for revision here. It has decided that the refusal of an inferior court to allow a plea to be amended, or a new plea to be filed, or to grant a new trial or a continuance, or to reinstate a cause which has been legally dismissed, cannot be questioned for error in this court. (Marine Ins. Co. of Alexandria *v.* Hodgson, 6 Cr., 206; Sims *v.* Hundley, 6 Howard S. C. R., 1.)

A fortnight after these dilatory motions had been disposed of, the cause was submitted to the Circuit Court on its merits.

The title of the plaintiff consists of a petition of Thomas De La Vega and two other persons, addressed to the Government of Coahuila and Texas, the 14th June, 1830, each to purchase eleven leagues of vacant lands, under the twenty-fourth section of the colonization law of Mexico. The Governor responded to the petition, that "he concedes in sale to each one of the petitioners the eleven leagues they solicit;" to be selected after the commissioner of the Supreme General Government shall have reserved a sufficiency of lands to meet the debt of the State. He orders the constitutional alcalde of the municipality to which the lands selected may belong, to give the possession of the leagues, to settle the class of the lands, so as to adjust the price, and to despatch the corresponding title in form. No further proceedings took place until May, 1832, upon this contract. At that date, one of the parties, for himself and the others, represented to the Governor the facts contained in his former memorial, and the executive order; that no impediment existed to the fulfilment of the contract, and that it might happen the parties would select lands within an empresario contract, and therefore prayed that either the alcalde before whom they might present themselves, or in case that he could not do so, that the commissioner of surveys might perform the acts requisite to the delivery of possession and the perfection of the title.

The Governor thereupon nominated the commissioner for the distribution of lands in the empresa to which the lands selected might belong, to perform the acts necessary; but, if they did not belong to an empresa, that the first alcalde of the respective municipality, or that most convenient, might act, so that, according to law and the instructions, possession might be given.

In the following year, (3d October, 1833,) Samuel M. Williams, professing to be attorney in fact for La Vega, presented authenticated copies of the petitions and orders before mentioned to the alcalde of the municipality of San Felipe de Austin, and solicited the location of his contract of purchase upon lands at a designated point on the Brazos river, within the colony of Austin and Williams, if they would consent, and referred to the order of the 2d May, 1832, as conferring an authority for that purpose. The alcalde granted the prayer of the petitioner, and directed that the consent of the empresarios should be obtained, and that the surveyor of the colony should survey the lands at the place designated, and should classify them so that the price might be settled. The empresario, Williams, consented for himself and as attorney for his partner, and the surveyor returned the order of survey with a figurative

plan and notes of survey of the eleven leagues. On the 4th October, 1833, the constitutional alcalde despatched the title in form, which contains a recital of the petitions, orders, consents, and survey, the authority conferred, the price settled, and the investiture of the possession and property. The plaintiff, on the trial, connected himself with this grant by conveyances which had been recorded, and as to which no question arose, except in reference to a power of attorney from La Vega to Williams, under which a deed had been executed in 1840 to Menard and Williams, in trust for Sophia St. John.

The defendant produced no documentary evidence of title, and relied on a possession of some two or three years.

No exception was taken in the Circuit Court to the introduction of the various public acts which constitute the evidence of a title in La Vega; nor was there exception to the charge of the court which pronounced the evidence adduced of its authenticity, competent. It may be proper to state that the title, in the Mexican language, was authenticated from the land office of Texas, and that the translation in the amended record in this court was used in the Circuit Court for convenience only. But the sufficiency of those papers to vest a title in the grantee, and their supposed want of conformity to the laws of Coahuila and Texas, were much debated, and the opinion of the court upon them has been properly reserved for the examination of this court.

The power of the Governor of those States to sell lands to Mexicans, not exceeding eleven leagues in quantity, is unquestionable; and the petition and order in 1830, in connection with the petition and order of May, 1832, are evidence of such a contract. The proceedings in 1830 are sufficiently identified by the statements and recitals of the papers dated in 1832, even if we were to hold that the absence of the Governor's signature to the first order is a fatal defect. But that petition and the executive order are certified by the Secretary of State as official documents; they were so treated by the Governor and the constitutional alcalde, and the petitioners, in the subsequent proceedings. The Secretary of State is designated in the Constitution of the confederate States to authenticate "all laws, decrees, orders, regulations, and instructions, circulated among the towns, or directed by the Governor to a particular corporation or person," and that without this requisite they shall not be obeyed or be productive of faith. At the present term of this court, we have decided that a decree not signed by the judge, but which is found in the record, and is certified by the clerk, and which has been executed by the parties, cannot be collaterally impeached for the want of the signature. (Se-

combe *v.* Steele, supra.) And the courts in Texas have decided that titles in form, executed without the requisite number of witnesses, are still valid, though there is a special requirement on the subject of the number of the witnesses in the law. (14 Texas R., 189.) We do not feel authorized to deny faith to the act certified by the Secretary of State as an official paper, nor can we assume that the order certified did not receive the executive sanction.

The Circuit Court instructed the jury, "that the court was required to take notice of the organization of the States of Coahuila and Texas, and of the officers who were competent to perform the duties imposed in the decree of the Governor, upon the petition of La Vega.

"The court charged, that there was no such organization of the colonies of Robertson, or of Austin and Williams, as to render it indispensable for the grantee to apply to a commissioner for distribution to perfect the grant of the Governor; that those colonies were not empresas in the sense in which that term was used in that decree; and that having reference to the location of the land and the situation of the parties, as is shown by the evidence, the alcalde of Austin was a proper officer for taking the measures requisite for the perfection of the grant." The land described in the title was situated within the limits of both the colonies before mentioned. The colonization contract of Robertson was granted in 1825; its execution was suspended in 1830; and it expired, by limitation, in 1831, and was not again renewed until 1834. The selection of the lands was made after it had expired, and before it was renewed. The history of this empresa has been judicially ascertained by the Supreme Court of Texas; and they have also decided that lands in a colony thus situated might be sold without reference to the empresario in such a contract. (Houston *v.* Robertson, 2 Texas, 1; Jenkins *v.* Chambers, 9 Texas, 167.)

The empresario contract of Austin and Williams was concluded in 1831, and included land embraced in the Robertson colony. This land was excluded from their contract in 1834, when Robertson's contract was renewed, and was restored in 1835. (Houston *v.* Perry, 5 Tex., 462.) No commissioner was appointed for this colony until September, 1835. The contract of an empresario obliged him to introduce colonists into a specific district. The colonist having a family was entitled to one league of land, of a particular quality, for which he paid a small sum to the Government. The empresario was paid five leagues and five labers for every one hundred families introduced. Of course, the excess of land within the limits of the colony, after

supplying the colonists and the empresario, remained to the Government. The commissioner of distribution was an officer of the Government, who superintended the fulfilment of the contract by the empresario. He ascertained the character of the colonists, allotted to them and the empresario their shares of land, and for that purpose appointed surveyors, received returns of survey, and executed the final titles. Usually this officer was not appointed until colonists were introduced, and a community was to be. formed. The sale of the land within the limits of the colony might disturb the interest of the empresario or of the colonists, and hence reference of the contracts of sale to the commissioner for execution. If there were no colonists, and the empresario opposed no objection, there was no reason why sales should not be made, nor was there any occasion for the services of a commissioner.

Sales of land could only be made to Mexicans, and no inquiries as to their character were required. We understand the decisions of the Supreme Court of Texas to be, that the alcalde was a competent and proper person to complete the titles on a contract of sale, where no organization of the colony had taken place. The case of Clay *v.* Holbert, 14 Tex. R., 189, resembles that before the court. The contract of sale is dated in 1831. The commissioner or alcalde was ordered to put the purchaser in possession, and to issue the corresponding titles. The lands were selected in the colony of Austin and Williams, in September, 1833. Williams consented for himself and partner. The survey was returned by Johnson, the surveyor. The alcalde, (Lesassier,) who officiated in this case, completed the title. The Supreme Court of Texas determined the grant to be valid. (Watrous *v.* McGrew, 16 Tex., 512; Ryon *v.* Jackson, 11 Tex., 374; Hancock *v.* McKenny, 7 Tex., 384; Jenkins *v.* Chambers, 9 Tex., 167.)

The Circuit Court further instructed the jury, "that the grant could not be defeated by proof that the principal surveyor did not in person perform the work of making the surveys, or because the survey was made before the order directed to the surveyor by the alcalde was entered on the grant," and, upon the whole case, that there was no such evidence of fraud in the making of the grant which would serve to defeat it in this action.

The charge of the court in reference to the survey, followed adjudications of the Supreme Court of Texas and of this court, in analogous cases. It was a common practice in Texas for empresarios and others to have their surveys completed in anticipation of the arrival of colonists, or the measures requisite for the procurement of the final title. The return of such sur-

veys by a surveyor, and their recognition by the commissioner or alcalde, was treated as a substantial compliance with the law. A surveyor might adopt the surveys of other persons. (Jones *v.* Menard, 1 Tex., 789; Howard *v.* Perry, 7 Tex., 259; Horton *v.* Pace, 9 Tex., 81; Jenkins *v.* Chambers, 9 Tex., 167; Doswell *v.* Lanzo, 20 How. S. C. R.)

In Hoofnagle *v.* Anderson, 7 Wheat., 212, this court say: "It is not doubted that a patent appropriates land. Any defects in the preliminary steps which are required by law are cured by the patent. It is a title from its date, and has always been held conclusive against all those whose rights did not commence previous to its emanation." In Boardman *v.* Reed, 6 Pet., 328, the defendants offered to prove that the lines were not run by a qualified surveyor; that the plats and certificates were made out by protraction, and had been surreptitiously returned to the register's office, and patents obtained.

The court said, "that at law no facts behind the patent can be investigated. A court of law has concurrent jurisdiction with a court of equity in matters of fraud; but the defects in an entry and survey cannot be taken advantage of at law. The patent appropriates the land, and gives the legal title to the patentee." (White *v.* Burnley, 20 How.)

So, if we were to consider the discrepancy of one day between the date of the preliminary order and the date of the certificate of the Secretary, and the absence of the Governor's signature, and the fact that one empresario consents for himself, and as attorney for his partner, without adducing that power; and that the officers do not affix to their names the name of their respective offices; and that the survey must have been made before the order, and probably by a deputy or other person, as marks of irregularity or of malpractice, our opinion could not be affected. In Stevenson *v.* Newman, 16 L. and Eq., Baron Parke, in delivering the opinion of the Court of Exchequer Chamber, says: "The effect of ordinary fraud is not absolutely to avoid the contract or transaction which has been caused by that fraud, but to render it voidable, at the option of the party defrauded. The fraud only gives a right to rescind. In the first instance, the property passes in the subject-matter," and "vests till avoided." And this court, after a full review of the subject, in Field *v.* Seabury, 19 How., 324, states the question and the answer applicable to this case. The question was: "When a grant or patent for land, or a legislative confirmation of title to land, has been given by the sovereignty or legislative authority having the exclusive power to make it, without any provision having been made in the patent or by the law to inquire into its fairness, as between the grant-

or and grantee, or between third parties, can a third party raise in ejectment the question of fraud as between the grantor and grantee, and thus look beyond the grant?" The reply of the court is, we are not aware that such a proceeding is permittted in a court of law.

But we do not assert that the circumstances enumerated constitute evidence of fraud. We have seen that the preliminary title is referred to, and recited in all stages through which it passed, and by every officer whom the law appointed to superintend its perfection, and that the survey was in accordance with the current and recognised practice of the country.

The title emanated from the State of Coahuila and Texas, a quarter of a century ago, when Texas was a wilderness. Colonists from abroad were invited, and a league of land was offered to the colonist having a family, for thirty dollars. Mexicans were allowed to purchase eleven leagues of ordinary grazing land for one hundred dollars the league; or of arable land for one hundred and fifty dollars. These eleven leagues were sold for less than twelve hundred dollars. Since that time, two revolutions in the condition of that State have been accomplished, and a vast improvement in the political condition of the country effected. The defendant entered upon the land in dispute after the second revolution was terminated, and after the burden and heat of the contest were over. He entered without a color of title. Neither the State of Coahuila and Texas, nor the Republic of Texas, nor the State of Texas, has taken measures to cancel this grant, nor have they conferred on the defendant any commission to vindicate them from wrong. He is a volunteer.

The doctrines of this court do not favor such a litigant.

The remaining questions presented by the bill of exceptions relate to the power of attorney from La Vega to Williams, under which a conveyance to Menard and Williams, in trust for Mrs. St. John, of Connecticut, was made in 1840.

The paper produced was the testimonio of an authentic act passed before the regidor of the illustrious Ayuntamiento of the city of Leona Vicario, and second alcalde in turn in it and its jurisdiction, who, by reason of the sickness of the first alcalde, &c., and bears date in 1832. The donee of this power located the land for La Vega, and solicited the final title in 1833, and conveyed the land in 1840. Its authenticity has never been questioned by La Vega, so far as is shown by the record.

The regidor is an officer known to the Spanish law, and to the legislation of Coahuila and Texas, (1 Tapia Freb., p. 197, sec. 10; Decrees 124, sec. 6; 262, sec. 11; Laws C. and T.;

Edwards *v.* James, 7 Tex., 383,) and was authorized to discharge the duties recited in the act. Evidence was adduced to the handwriting of the regidor and the assisting witnesses; besides, proof was made that two of them were dead, and the other, beyond the limits of the United States. Considered as the act of a foreign officer, without the support of this proof, the Supreme Court of Texas, in Paschal *v.* Perez, 7 Tex., 348, say: "Its admissibility and effect is by no means a settled question at common law, and on the principles of international jurisprudence. Whether the rules of evidence of the forum are to be exclusively observed, or whether those of a foreign country are to have weight, was considered by Mr. Justice Story as an embarrassing question, and which was not settled. (Story's Conf. Laws, 634.) But the court in that case, and in the case of De Leon *v.* White, 9 Tex., 599, decide that a testimonio is sufficiently established by evidence of the handwriting of the officer, and the assisting witnesses. (8 Tex., 210.) The conveyance to the trustees, for the benefit of Mrs. St. John, an alien, was not invalid, nor can the conveyance be impeached by this party, or in this mode of proceeding.

The averment in the petition of the citizenship of the parties corresponds to the form commonly used in the District Court of Texas, and which has never been questioned in the various causes which have heretofore been before this court from that district.

We think that the allegation is sufficiently specific.

Judgment affirmed.

Mr. Justice DANIEL dissenting.

I find myself constrained to differ with my brethren as to the views they have taken of this case—views more accurate, perhaps, than my own; yet differing so materially from my apprehension of the law of the case as to impose, according to that apprehension, the duty of endeavoring to explain what by me is deemed its true aspect.

The difficulties and irregularities incident to the removal or to the modification of pre-existing institutions by the introduction and superior control of systems really or seemingly incompatible with the former, must necessarily involve the hazard of error, and impress therefore the propriety of great caution with respect to innovations to be adopted.

Wherever the obligation exists to harmonize portions of the previous system with the creation and the exigencies of a new regime, the safest, indeed the only safe guide, must be found in the adherence to enlightened and generally-admitted principles, as a guaranty for the rights and duties deducible both

from the past and from supervening institutions. In following such a guide, I am conducted to conclusions differing from those which have been reached by the majority of this court in this case.

Conceding in its utmost extent a power in the colonial Governor or political head of Texas to make grants of land; conceding, too, for argument's sake, an entire exemption in the plaintiff below from all obligation to produce the original of a grant made by the competent officer; admitting, also, the sufficiency of a copy from the record, still I hold that a copy, in order to become evidence, must purport upon its face to be a full and perfect copy, and must be verified by some competent person. The grant, or the paper claimed to be a grant in this case, is defective upon its face. In the first place, it is without date, and consequently can be identified or coincident as to *time* with no document in this cause; it is not signed by any person whomsoever, in the name or character of Governor, nor by a deputy, nor by a person professing to be clothed with authority to sign such an instrument. In its structure, it commences by speaking in the *first person*, as if by the maker of the grant, but breaks off before reaching the conclusion, and is incorporated or converted into a certificate, dated June 13th, 1839, by Santiago del Vallee, signing himself a Secretary, stating that so far as he has given this document, it is a true copy. This certificate, then, is a confession, *in terms*, that the entire act of the Governor is not given, but that the document is incomplete.

The rule of evidence is, with regard to copies, that they must be *complete*, and must be properly authenticated. Records are never allowed to be adduced in evidence, unless they are perfect records. It is never permitted to garble them, nor to read parts of them, or extracts from them, as evidence. Yet here we have a paper introduced as a *record*, as the act of the Governor, when the proof relied on to sustain it conclusively shows that the record, if it be one, is incomplete; that it in fact is falsified by itself; and the act of the Governor, if it be his act, is not permitted to speak for itself; but an attempt is made to establish that act by a wholly distinct and independent declaration, by a person styling himself a Secretary.

Every foundation of the plaintiff's claim, so far as it is made to rest upon this alleged grant, or on the verity of the copy, must fail.

This defect in the evidence appears to have been perceived, and its force felt; and hence, perhaps, the effort at the removal or remedy thereof, by the introduction of a petition bearing date on the 2d of May, 1832, signed by Joseph Maria Aguirre, on

behalf of himself and the other parties to the former petition, in which it is recited that the Government had conceded to himself and his associates on sale on certain conditions, on the 14th of June, 1830, the leagues of land now asked for in this renewed petition, (no quantity or number being set forth,) and then further states, that the conditions on which the concession here spoken of having been removed or fulfilled, it prays that the proper officers may be appointed to survey the lands, and to put the petitioners in possession. Following this petition, is an order or decree of the same date with the petition, and signed Letona, not styling himself Governor, nor assuming any official designation; but the order is certified by Santiago del Vallee as being a copy from the archives in his charge, and stating that he had been commanded to take this copy from the archives by the disposition of the most excellent Governor.

Upon a recurrence to this petition of the 2d of May, 1832, signed Jose Maria de Aguirre, and to the decree or order of the same date, it will be perceived that neither of these papers contains any description or quantity of land. The petition has reference to an alleged grant as made on the 14th of June, 1830, (nowhere shown;) the order or decree refers to some act or proceeding of the political chief of the Department of Bexar, (nowhere exhibited on this record,) of the 2d of June, 1830, which, of course, cannot be identified with the alleged concession of a different date, viz: of the 14th of June; and the prayer of this petition of Aguirre and the order of Letona can by no correct induction be received as curing the defects in the first alleged grant, or as supplying the absence of date and of signature, by any official, of any denomination or of any grade of power whatsoever.

But it has been supposed that these material defects have been remedied by the act of Lesassier, purporting to put the parties, or rather La Vega, one of them, into possession. To this suggestion it may be replied, in possession of what? It surely cannot be pretended that Lesassier had any rightful authority to create or to originate or to authenticate a grant. He could not determine the rights of claimants, nor decide upon the extent of concessions made by the Government. He had no judicial or discretionary powers touching these matters; he was merely a ministerial and subordinate agent, to execute the orders of his superiors; and accordingly it is seen that in his account of his proceeding he has constant reference to the orders and decrees, recognising these as the only authority for his acting at all. His acts could have no effect whatever, either to confirm or to invalidate those orders or decrees, and of course

could not supply any defect or insufficiency in their provisions, or in the authentication of them.

This paper, purporting to be the act of Lesassier, is in itself defective as to the proof of its verity; for it is not introduced as a copy from a record, nor established upon proof of the signature thereto; nor upon the testimony of the assisting witnesses at its execution; nor is the absence of those witnesses accounted for.

In the next place, with respect to the deduction of title from La Vega, to whom it is said a grant was made by the Government, by the decrees just examined. The first step in the deraignment of this title is the paper styled the power of attorney from La Vega to Williams, dated May 5th, 1832. The authenticity of this paper rests upon no foundation of legitimate evidence. It cannot be considered as possessing the dignity and verity of a record, nor of a copy from a record. It is not shown that the laws of Texas required it to be recorded; and without such a requisition it could not be made in legal acceptation a record, by the mere will or act of a private person. This paper does not appear to have been placed on record, and if in truth it had been recorded in a proper legal sense, still there is no copy said to have been taken from a record, or certified by any legal custodian of the record or of the original document. This paper is signed by Juan Gonzales, who certifies that it was copied, *not* from the *public archives*, but from the *original*, with which he says that it agrees. This certificate is an assertion that the document certified was not copied from a record—that it is not the original, and that the certificate was not and did not purport to be proof of the *xecution* of the original. Where, then, is found proof of this instrument, with respect either to its dignity as a record, as a copy from a record, or as to the truth of its *execution* by the parties thereto? It has been seen, then, that this document is neither a record nor a copy from a record. The language of the instrument and that of the certificate of Gonzales alike contradict any such conclusion; the certificate declares it to be a copy of a private paper, and nothing more. The next inquiry pertinent to this alleged power is as to any authority in Gonzales to certify copies of records, and still more to certify copies of private papers in the possession of parties—papers, the execution of which he did not see—and by such certificate to conclude or prevent all inquiry into the *fact* of their execution, or of the *bona fides* with which they may have been prepared. Here there is no pretence to proof of *execution* of the alleged power. The *instrumentary witnesses,* as they are termed, the witnesses present at the execution of the instrument, (and in this instance there appear to

·have been three,) were not called, nor was any reason assigned for their absence; they seem not to have been even thought of; and with respect to those who are called the *assistant witnesses*—the witnesses to the certificate of Gonzales—although it·is sworn by Hewetson that one of these witnesses was dead, and the other, J. M. Morel, resided· in Mexico, no. effort by commission or otherwise was made to procure his testimony, nor was there proof of the impracticability of procuring it. The irregularities connected with·this·alleged power of attorney seem to me too glaring, and too obviously liable to gross abuse, and tend too strongly to injury to the rights of property,·to be tolerated in courts governed by correct and safe rules of evidence. ·

The objections urged by the defendant below to the legality of the documents above commented upon, and to their relevancy to·the issue between the parties, appear to have been substantially and sufficiently reserved in the fourth and·fifth· bills of exception. by the defendant, and satisfy me that those documents should have been ruled out of the cause.

It seems to me that there was error in the instruction of the court to the jury, that there was no fraud in the transactions by which the alleged title to the land in controversy had been obtained or transmitted to the plaintiff.

In this action, the plaintiff could succeed or should have succeeded in virtue. of a legal, valid, perfect title, and none other adverse possession, with claim of right, was title until a clear, fair, honest, legal, paramount title in the plaintiff was shown. If, therefore, the documents upon which the claim of the plaintiff was based should have been found to carry with them, either upon their face or in the manner of their procurement, any of the badges of fraud, this would have been a sufficient objection to their validity. A blemish, or a defect, or an infirmity, in that necessarily fair and legal title, by which the possession of the defendant, presumed legal as against all but the true and rightful claimant, could be displaced, would be fatal. What were the circumstances attending the fabrication or procuring of the documents relied on by the plaintiff, or the manner in which they were transmitted to him, were, it seems to me, subjects exclusively appropriate to the consideration of the jury. The inquiry in this case was not one arising solely upon the construction of written instruments; it embraced also the conduct of agents alleged to have been the makers of those instruments; the discharge of these duties in the exercise of powers ascribed to them; and the honesty and good faith of those professing to have dealt with them, and to have derived and to have transmitted rights founded upon

those transactions. These considerations, in connection with the incongruities as to dates, and the apparent deviations from regular official proceedings, and in the conduct of those through whom the title is traced by the plaintiff, from what is usual, appear to be inseparable from the inquiry of fraud in fact and in intent, and should have been submitted to the jury, from whom they were withdrawn by the instruction of the court.

It is unquestionably true, that in courts whose proceedings are regulated by the rules of pleading at the common law, matter in *abatement* is not allowed to be pleaded after pleading in *bar*, unless, indeed, the matter tendered in abatement shall have arisen, or shall have come to the knowledge of the pleader, *puis darrein continuance;* and when such matter is allowed in defence, all that has been previously relied on in bar is considered as relinquished. Such, however, has been represented as not having been the rule adopted in Texas. There it·has been said that a defendant may plead both in bar and in abatement. In this case, the matter tendered was accompanied by an affidavit of its discovery since the issue in bar; but no evidence appears upon the record of an offer to withdraw the latter; nor am I aware of the necessity of a formal proffer to that effect. The matter tendered in abatement should, if material, be admitted; and where so admitted, the matter previously relied on in bar is by legal consequence, and without any necessity for an express order upon the defendant, thereby waived. It is true that the decision of the Circuit Court rejecting this plea is not matter for reversal here, but the consent or acquiescence of the party in sheltering himself under an artificial rule, in a controversy in which was impugned the good faith of that party, is matter for regret, at least, and cannot be altogether indifferent in an inquiry seeking an examination into the fairness of the transactions involved. The removal of this cause from one portion of the district of Texas to another, in neither of which the district judge, upon the facts conceded as known to him, was competent to take cognizance of it, we are told may be presumed to have taken place by consent. Upon what fact such a consent can be inferred, this record does not disclose; and it is difficult to conceive any reason existing with the defendant below for such consent. There are presumptions, however, connected with this removal *within* the district, from which there can be no escape.

First. It must be presumed that the district judge was cognizant *ab initio* of his acknowledged interest in the subject in controversy.

Secondly. It must be presumed that he was also cognizant of his absolute disqualification, by reason of that interest, from

making any decision or holding any plea in the cause; and that the removal of it from one point to another within the district was an useless as it was an irregular and illegal act.

Thirdly. It must be presumed, that knowing himself to be thus disqualified, he could have no legitimate power to retain the cause under his own control for several years;—that such a retention might be oppressive as it was illegal; and that his only power was that which the law imposed upon him as a duty, the power of an immediate removal of the cause, upon its institution, to a tribunal exempt from disqualifications which he knew existed with reference to himself. It may truly be thought to have been a mistaken and unfortunate course in those to whom the interests of the district judge were confided, that they did not seek, nay, challenge and insist upon investigation, rather than exclude it under the stress of a *formula* in pleading, the application of which was of doubtful propriety, if not irregular in this case. By a different proceeding, they might have met directly charges openly alleged, and might have removed implications, to which the suppression of inquiry may have imparted a semblance of truth.

Upon the considerations hereinabove stated, and with a view to the more thorough investigation as to the law and the facts of this cause than the record before us has disclosed, it is my opinion that the judgment of the Circuit Court should be reversed, and this cause remanded to that court for a new trial to be had therein.