# CHUNN *v.* CITY & SUBURBAN RAILWAY OF WASHINGTON.

---

PRACTICE; AMENDMENT; APPEALABLE ORDERS; STREET RAILWAYS; NEGLIGENCE; CONTRIBUTORY NEGLIGENCE.

1. The grant or refusal of leave to amend is not reviewable on appeal, being within the discretion of the trial court (following *German Evangelical Soc.* v. *Prospect Hill Cemetery*, 2 App. D. C. 310, and *Brown* v. *Baltimore & O. R. Co.* 6 App. D. C. 237); and that the amendment may relate to the withdrawal of a plea in bar, and the substitution therefor of a plea in abatement, or the reverse, does not alter the rule.

2. Whether it is negligence for a suburban electric railway company to run a car past a usual stopping place, when persons can be seen standing at such place between the inner rails of the two tracks awaiting a car approaching from the other direction, is a question for the jury,—especially where the company knows that intending passengers frequently stand in such space, and has given sanction to the practice by opening the car gates and permitting them to enter from that side.

3. Where, in an action against a suburban electric railway company to recover damages for personal injuries, it appeared that the plaintiff, a woman, was standing in a planked space between the inner rails of the double tracks of the defendant, at a usual stopping place, where there was a crossing for vehicles, waiting for an approaching south-bound car, and was struck by a north-bound car which did not slow up at such point; that when cars there passed each other there was a space between them of 3½ feet; that one of the plaintiff's witnesses, a man, was standing between the rails when the plaintiff was injured and escaped unhurt, and he testified there was ample room to stand in if one was thinking about what one was doing, and it also appeared that a car approaching in either direction could be seen a quarter of a mile away, it was *held* that the plaintiff was guilty of contributory negligence in law, and the trial court was right in directing a verdict for the defendant. (Following *Edgerton* v. *Baltimore & O. R. Co.* 6 App. D. C. 516; *Harten* v. *Brightwood R. Co.* 18 App. D. C. 260; *Barrett* v. *Columbia R. Co.* 20 App. D. C. 381, and *Stewart* v. *Washington & G. F. Electric R. Co.* 22 App. D. C. 496.)

No. 1393.    Submitted April 12, 1904.    Decided May 4, 1904.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia, on a verdict directed by the court in an action to recover damages for personal injuries.                    *Affirmed.*

The COURT in the opinion stated the case as follows:

The appellant, Sarah Chunn, began this action August 3, 1901, to recover damages for personal injuries.

August 29, 1901, defendant, The City & Suburban Railway of Washington, pleaded the infancy of the plaintiff in abatement of the action. The next proceeding was a motion by defendant for leave to withdraw the plea in abatement and plead in bar, which was granted March 20, 1903, conditioned upon the payment of all costs to date. The motion to withdraw was supported by an affidavit showing that the plea in abatement had been filed in good faith, founded upon a statement made by plaintiff to the effect that she was but nineteen years of age.

The defendant then having pleaded not guilty, the plaintiff joined issue and the trial was had June 1, 1903.

The plaintiff moved the court to reconsider the order permitting the leave to plead in bar, because improvidently passed, and demanded trial on the plea in abatement. In connection with this motion a tender was made of the sum of $15.15, the same being the sum collected by plaintiff as costs under the said order. The court overruled the motion, and plaintiff excepted. Plaintiff then offered the following evidence as recited in her bill of exceptions:

"Sarah Chunn, the plaintiff, testified that she is twenty-three years of age. On September 29, 1900, she was working for Mrs. Reed in Riverdale, Maryland. Mrs. Reed lived on the east side of the defendant's railroad tracks. On the evening of this day she left Mrs. Reed's house with the intention of coming

to the city of Washington, District of Columbia, upon one of defendant's cars. She had often done this before. She remembers a conversation with Mrs. Reed just before leaving her house. The next thing she remembers is that she was being taken from the Emergency Hospital to another hospital. She has no recollection of how she was injured. She also testified as to the nature and extent of her injuries, and as to the persons who had employed her since her injury, giving their names and addresses.

"On cross-examination she testified that she had lived with Mrs. Reed for about a year before the accident; that she came into Washington about once per week while she was there, always by the electric cars; that Mrs. Reed lived on the right-hand side of both the B. & O. and electric railroad, going east; that the B. & O. is between the electric railroad and Mrs. Reed's house; that she could not give any account of her movements from the time she left Mrs. Reed's house until she came to consciousness at the Emergency Hospital, and could give no reason why she could remember the conversation with Mrs. Reed, and could not remember her movements from that time until she was injured.

"William R. Moulden, a physician formerly employed at the Emergency Hospital, in the city of Washington, District of Columbia, testified by deposition as to the nature and extent of the plaintiff's injuries.

"Charles M. Sizer testified that he resides at Riverdale, Maryland, and is employed in a branch of the Government Printing Office in the city of Washington, District of Columbia. He lived at Riverdale before the defendant's railroad was built there, and has lived there since then. On September 29, 1900, at the station of Riverdale, there was a board platform practically even with the tracks, built between the rails of each track and between the two tracks of the defendant's railroad. On the west side of the west track two boards of this platform project beyond this track. The west side of the track has a kind

of sink. When the car comes along the step covers that board, and you have to stand out in the mud or in that hole to get on the car. Prior to September 29, 1900, it was the custom of persons intending to take passage from Riverdale on defendant's cars running on the west track to stand between the two tracks on this platform, and board such cars from the east side. He had often entered cars of defendant going to the city of Washington on the west track from this platform between the tracks. The servants in charge of these cars running on the west track would stop them at Riverdale, and open the doors or gates, as the case might be, and permit persons to enter them from this platform between the tracks. This had been customary ever since the road began running and up to September 29, 1900. Persons standing on the platform between the tracks at this point can see north about half a mile to a station called College, and can see south about quarter of a mile to the block where the road curves to go to Hyattsville. He had stood on the front platform of cars running toward Riverdale from the south, and could see the platform at Riverdale when the cars rounded the curve, and could distinguish people standing upon the platform, but could not tell who they were. On the evening of September 29, 1900, he was standing at the southwest corner of the B. & O. station at Riverdale, waiting for his wife to come from Washington on defendant's road. While standing there he saw the plaintiff and another person standing on the platform between defendant's tracks. At this time there was a car approaching Riverdale from the north on the west track, and one approaching from the south on the east track. That the car approaching on the west track slowed down to stop at Riverdale, but the one approaching on the east track did not slow down, but ran across the platform at a rapid rate of speed. His view of the girl was shut off by the passing car on the east track. When the car had passed the girl had disappeared. He then saw an object lying between the tracks, which proved to be the girl. She was lying between 12 and 15 feet

from the platform, toward the west track between the tracks. There was plenty of light for him to see the girl plainly as she stood on the platform between the tracks, from where he stood at the southwest corner of the B. & O. station. The car on the east track ran almost to the cross road before it stopped, between 100 and 200 feet beyond the platform. He saw the girl after the accident; she was unconscious and had a knot on her forehead as large as your fist. It is not exactly a platform, but the boards are put down even with the ground and it is boarded over between the two tracks; there are two boards on the outside on either side. Saw the plaintiff walk over to the cars. There was a car coming from Washington at the time and one from Berwyn. It was light enough so he could see them plainly. Just before the cars arrived he saw the plaintiff and another person standing between the tracks where they get on the cars going toward Washington. Saw plaintiff standing there until the car coming from Washington passed between himself and her, which obstructed his view. Don't know exactly how far she was from the place where she was standing after she was struck. Guesses the car stopped 100 feet or more beyond where she was standing. The car going from Washington was going very fast. I don't know exactly the speed of it. The one going toward Washington was going slow and stopped right at the platform.

"On cross-examination he testified that what he called a platform was simply some boards laid down lengthwise, about two boards on either side of the outer track, and the space between the tracks and rails is covered with boards; that the boards lay on the ground and sleepers of the railroad. It is not raised from the ground and is about on a level with it. The dirt may possibly be an inch lower than the boards; that there is a road on the west side running parallel with the track and comes down very close to the tracks. The county road is very close to the electric road and a good many people pass backwards and forwards. The platform serves for people to walk across that

place. People also drive over the railroad tracks there on these boards, but it was never intended for that. That at the time and prior to this accident people got into the cars going towards Washington from both the east and west sides; whichever side a person was on they would let them in. There were other people there at the time of the accident to get on the Washington-bound car and did get on, but the only two he saw on the boards between the tracks were the plaintiff and Mr. Hogan. The other people had not gone out. First saw the plaintiff that night between the two tracks, on the boards; she was standing still. When he saw her standing between the tracks neither car had reached the point where she was, but both were approaching it and near the place; that a person standing where she was could see at least ¼ of a mile in the direction of Washington and at least the same distance in the other direction.

"John H. Hogan testified that he lived at Riverdale, Maryland, and has resided there for ten years, and was residing there on the 29th day of September, 1900. On the west side of the west or south-bound track of defendant's railroad was an incomplete dirt roadway; this roadway was not in very good condition for passing across from the roadway to the station. So far as his practice and observation went he and others entered the cars from the east side—all cars going both ways. On the evening of the 29th of September, 1900, he was at the B. & O. station at Riverdale. He intended to take a car on defendant's railroad for Washington. The plaintiff was also at the B. & O. station at this time. When the car on the west track coming south toward Washington came in sight he went to the platform between the tracks of the defendant's road, as he was in the habit of doing. He incidentally noticed the approach of the car from Washington at about the same time, and realized that he would have to hold himself strictly in the center of the two tracks, and he stood in that position. The plaintiff also went to this platform between the tracks about the same time. He stood at the south end of the platform, and the plaintiff

stood toward the north end. He saw her standing there. In about from half a minute to a minute a car coming from the south toward the north on the east track passed. It did not stop at the platform. He heard a shock and looked and did not see anything of the plaintiff. At this time the south-bound car had reached the platform. It stopped there. The car running north passed the platform at from about 12 to 15 miles an hour. It stopped between 60 and 90 feet beyond the platform. The plaintiff was found unconscious lying 10 to 15 feet from the north end of the platform, between the tracks, near the west track. A person standing on the platform between the tracks could see 100 yards in either direction; the trolley poles would obscure a further view. The track curves toward the south. When the cars of the defendant pass each other at the station platform at Riverdale there is about 3 feet 10 inches space between them. At the time the accident took place it was light enough to recognize a person 100 yards away.

"On cross-examination he testified that he did not see the plaintiff approach the tracks, but saw her standing on the north end of the platform between the tracks while he was standing there waiting for the Washington-bound car to come up; that he was waiting there from a half a minute to a minute, when the car came. That the curve west of Riverdale is not much of a curve, not enough to hide a car. That standing between the tracks at the point in question you can see a car for ¼ of a mile approaching from either direction. That the car he was to take reached the platform first; that it had stopped or nearly so when he heard the concussion.

"In response to questions by the court the witness said that he was standing between the two cars when the car that was going from Washington passed, and that there was ample room to stand if you were thinking about what you were doing; it was over 3 feet.

"Frank E. Jett, a physician employed at the Washington Asylum Hospital, identified certain records of that hospital re-

lating to the plaintiff, and these records were then read in evidence.   They showed the plaintiff's condition and treatment while in that hospital.

"Fannie M. Reed testified that she lived in Riverdale, Maryland, on September 29, 1900, and that the plaintiff was in her employ at that time.   On that evening the plaintiff left her house, saying that she was coming to the city of Washington. She next saw the plaintiff at the B. & O. station on that same evening.   This was after the accident, and the plaintiff was then unconscious.   She, witness, had often taken cars on the defendant's road to the city of Washington running on the west track, and in so doing had stood on the platform between the tracks.   She also testified as to visits to plaintiff at the hospital, and as to plaintiff's condition after she left the hospital.

"Richard Connor testified that he lives in the city of Washington, District of Columbia.   A few days previous to the trial of this case he went to the station at Riverdale, Maryland, at the request of the plaintiff's attorney and made some measurements.   He found the platform located between the defendant's tracks at that point to be 30 feet long.   The distance between the inner rails of the two tracks is 7 feet 10 inches.

"There is a trolley post situated north of the platform 31 feet 2 inches.   It is 67 feet from the middle of the platform to the southwest corner of the B. & O. station.   He had placed a stick against the step of one of defendant's cars, and measured from this stick to the track, and found that this step projected 2 feet 2 inches beyond the rail of the track.   This car was one of those large green cars that run on defendant's railroad.   A person standing between the tracks can see north about ½ a mile, and can see south about ¼ of a mile.   While standing on the platform witness saw a person south about that distance."

Upon the conclusion of this evidence, the court sustained a motion made by defendant to direct a verdict in its favor; and from judgment thereon the appeal has been taken.

*Mr. Victor H. Wallace* and *Mr. Percy Metzger,* for the appellant:

1. Lord Holt said in the case of *Crosse* v. *Bilson*, 2 Ld. Raymond, 1022: "When the defendant pleads a matter of fact in abatement, and the plaintiff in his replication traverses or takes issue thereon, there it is proper for him to pray damages, because if it be found against the defendant, judgment final shall be given." And the Encyclopedia of Pleading & Practice, vol. I., page 31, title Abatement, states the law to be: "Where an issue of fact joined on a plea of abatement is found in favor of the plaintiff the effect of it is an admission of the merits of the plaintiff's claim, and the judgment thereon is final in favor of the plaintiff, and the jury which determines the issue should determine the plaintiff's damages." How firmly these principles are established in law is evidenced by the following cases and text books, all of which have been carefully examined: *Bonner* v. *Hall*, 1 Ld. Raymond, 338; *Eichorn* v. *Le Maitre*, 2 Wilson, 367; *Thompson* v. *Colier*, Yelverton, 112; *Amcots* v. *Amcots*, Thomas Raymond, 118; *Bowen* v. *Shapcott*. 1 East, 542; *Foxwist* v. *Tremaine*, 3 Wms. Saund. note 3, page 211; *Hollingsworth* v. *Duane*, Wall. C. C. 51; *National Asso.* v. *Spiro*, 78 Fed. 775; *Alling* v. *Shelton*, 16 Conn. 436; *Goggin* v. *O'Donnell*, 62 Ill. 66; *The Italian, etc., Colony* v. *Pease*, 194 Ill. 98; *Thompson* v. *Greenwood*, 38 Ind. 327; *Moore* v. *Morton*, 1 Bibb. (Ky.) 234; *Good* v. *Lehan*, 8 Cush. (Mass.) 301; *Com.* v. *Carr*, 114 Mass. 280. A criminal case. *Dodge* v. *Morse*, 3 N. H. 232; *Chase* v. *Deming*, 42 N. H. 274; *Haight* v. *Holley*, 3d Wend. 258; *Mechanics Bank* v. *Dakin*, 24 Wend. 411; *Myers* v. *Erwin & Co.* 20 Ohio, 382; *Mehaffy* v. *Shane*, 2 Penrose & W. 361; *Straus* v. *Weil*, 5 Coldw. (Tenn.) 120; *Vanderberg* v. *Clark*, 22 Vt. 185; Tidd's Practice, 640; Comyns, Dig. title Abatement, p. 143; Gould, Pl. p. 277, § 159; Chitty, Pl. p. 455; Evan, Pr. 195; Cox, Pr. 55; Stephen, Pl. 133. See also forms of postea, judgment, and execution given for plaintiff, in Archibold's forms. Now the minute the plaintiff joined issue on the defendant's plea in abatement, the negligence of the defendant was admitted, and the question of con-

tributory negligence passed out of the case; all the plaintiff was bound to prepare to prove at the trial were the facts relating to her age and the amount of damage she suffered; every other material fact in her case was admitted by the defendant. For seventeen months the defendant lulled the plaintiff with this belief, and without protest of any kind, and without any intimation that there would be a request for a withdrawal of the plea in abatement, it permitted the plaintiff to take evidence under this plea. Not until the case was actually called for trial, and when the plaintiff was present in court ready to go ahead and prove her case under this plea, did the defendant give the least notice that it desired to withdraw this plea. It was then stated by counsel for the defendant in open court that he intended to file a motion for leave to withdraw this plea. This motion was afterwards filed and granted. The only remedy open to the plaintiff upon the granting of this motion was a special appeal to this court, which was immediately prayed, and subsequently denied. The plaintiff, however, did not waive the question, but again raised it by the motion set out in the bill of exceptions before any evidence was offered at the trial. We submit, with entire deference to the learned trial justice, that the order granting the motion to withdraw the plea in abatement, and the subsequent refusal to reconsider this order, and the refusal to permit the case to be tried under the issue joined on this plea, all amounted in law to an abuse of discretion, requiring a reversal of the judgment. See *Yeatman* v. *Henderson,* Fed. Cas. No. 18,132; *Robbins* v. *Treadway,* 2 J. J. Marsh. 540.

2. The undisputed facts are that a woman desiring to take passage on one of defendant's cars went to a place designated by custom as the proper place for passengers to stand who were to take passage on these cars, and while standing there, and in plain view of the motorman of an approaching car, who could see that she was about to be caught between his car and another approaching in the opposite direction, was deliberately

run down by him and injured. Surely the jury should have been permitted to pass upon the question of his negligence.

This woman was standing upon the platform of the defendant, and by its implied invitation; it was therefore the duty of the defendant to see that she was not injured. It was urged below that there was no evidence that the defendant ever built this platform. This is answered by the language used in the charge to the jury in the case of *Betts* v. *R. R. Co.* 191 Pa. 575, cited, with approval, by the supreme court on appeal. In this case a railroad company was in the habit of receiving and discharging passengers from certain trains between tracks in the streets of a city. While attempting to board one of these trains a person was injured by another train passing on a parallel track. It was there said: "Whether that is a public street or not, they (the defendant's servants) had used the ground there for the purposes of a platform, not only where the platform was, adjoining the station, but also the ground east of the main track of defendant company. If it had been their custom to so use that ground, then, as far as the purpose of this suit is concerned, or so far as the people of that community are concerned, who had knowledge of that custom, they had made the street their platform for the purpose of receiving and discharging passengers." It was the duty of a servant in charge of one of defendant's cars, on approaching this platform, to have it under such control that it could be stopped in time to avoid injury to a prospective passenger standing upon this platform. This was not done in the present instance, and serious injury resulted. That the jury should have decided such a case as this is well established by a number of cases in the Supreme Court of the United States, and in this court. Among others may be cited: *Warner* v. *B. & O. R. Co.* 168 U. S. 339; *R. R. Co.* v. *Lowell,* 151 U. S. 209, 219, 220; *Inland, etc., Co.* v. *Tolson,* 139 U. S. 551, 558, 559; *R. R.* v. *Amato,* 144 U. S. 465; *R. R. Co.* v. *Ives,* 144 U. S. 408; *R. R. Co.* v. *Powers,* 149 U. S. 43; *Jones* v. *R. R. Co.* 128

U. S. 443; *Traction Co.* v. *Lusby,* 12 App. D. C. 295–300, 301; *Adams* v. *R. R. Co.* 9 App. D. C. 26, 30, 31; *R. R. Co.* v. *Golway,* 6 App. D. C. 143, 165. The two following cases may be appropriately cited as being exactly in point: *Beotjen* v. *N. Y. & H. R. Co.* 55 N. Y. Supp. 847; *Conway* v. *New Orleans, etc., R. R.* 51 La. Ann. 146. Also see: *R. R. Co.* v. *Sue,* 25 Neb. 772; *Dale* v. *Ry. Co.* 1 Hun, 146; *Dobieski* v. *Sharp,* 88 N. Y. 203.

*Mr. J. J. Darlington, Mr. C. C. Cole,* and *Mr. B. W. Parker* for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. The grant or refusal of leave to amend is a power intrusted to the trial courts that injustice and hardship may be prevented and the merits of the case fairly tried. Whether in the particular instance the leave should be granted or refused is a matter within the discretion of the trial court, and is not reviewable in the appellate court. *German Evangelical Soc.* v. *Prospect Hill Cemetery,* 2 App. D. C. 310; *Brown* v. *Baltimore & O. R. Co.* 6 App. D. C. 237, 242; *Morris* v. *Wheat,* 11 App. D. C. 201. That the amendment may relate to the withdrawal of a plea in bar and its substitution by one in abatement, or the reverse, does not alter the rule. *Eberly* v. *Moore,* 24 How. 147, 158, 16 L. ed. 612, 614; *Spencer* v. *Lapsley,* 20 How. 264, 267, 15 L. ed. 902, 904.

2. The questions arising under the evidence offered by plaintiff were, first, whether it was sufficient to warrant the inference of defendant's negligence, and, if so, whether it plainly appeared therefrom that, notwithstanding that negligence, the plaintiff's injuries were the result of her own want of ordinary care under all the circumstances.

The contention of the appellant rests upon the proposition that running the outgoing car at a high rate of speed and not

reducing the same to an easily controllable rate, or stopping it altogether, at the point where the incoming car, for which plaintiff waited, was about to stop to take on passengers, constituted culpable negligence. The case upon which the appellant most strongly relies for the principle to support her contention on both points is that where a passenger who had waited at a station for a local train going in one direction was run down and killed by an express train going in the other whilst he was crossing the tracks to take his own train, which was just coming to a stop at the platform on the opposite side. *Warner* v. *Baltimore & O. R. Co.* 168 U. S. 339, 344, 42 L. ed. 491, 495, 18 Sup. Ct. Rep. 68. That, being a steam railway, maintained stations at which the local trains, at least, always stopped for passengers, though the express trains did not.

In reasonable anticipation of the dangers attending the constant and forced crossing of the tracks at such stations, the defendant, itself, had promulgated a rule—though the same had been generally disregarded by its employees as too restrictive of rapid transit—prohibiting the running of trains past a station when another train might be there receiving and discharging passengers. *Boentgen* v. *New York & H. R. Co.* 36 App. Div. 460, 55 N. Y. Supp. 847, was that of a street railway operated under a like rule. The defendant in this case—an electrical street railway—maintained no stations, but stopped at street intersections and other places, including the one in question, upon signals given by passengers or persons waiting at the same. The evidence concerning the platform so often mentioned in the testimony is very unsatisfactory. It does not seem to be a platform for the use of passengers in getting on and off the cars, but consisting of planks laid upon the ground both within the rails of each track, and the space between the said tracks would seem to be for the purpose of a crossing for vehicles as well as persons at the point. The appellee had no rule like the one mentioned in the cases cited, nor is there any evidence of its ordinary or customary practice in that regard. It

was well aware, however, that persons frequently stood in the space mentioned when waiting to take the car for the city, and had given sanction to the practice by opening the car gates and permitting them to enter from that side.

Whether, then, under all the circumstances, it was an act of negligence to run the outgoing car past the place when people could be seen standing in the space waiting for the other car, and in such proximity to the track as to indicate the special danger of one of them, is a question proper for the determination of the jury ordinarily.

3. The question of contributory negligence remains to be considered, for if that has been so plainly shown as to make it a matter of law for the determination of the court, the negligence of the defendant is immaterial.

Carefully considering the evidence in the light of all reasonable inferences that can be drawn from its undisputed facts, our conclusion is that the plaintiff's injuries were the result of her own want of ordinary care. The distance between the inner rails of the two tracks was 7 feet and 10 inches, and each car projected 2 feet and 2 inches beyond the rail. Consequently the clear space between uniting cars was 3½ feet. A car approaching in either direction could readily be seen ¼ of a mile away. One other person stood in the said space in safety while the car passed. He saw it coming, but did not leave the space. He saw plaintiff beyond him, but was unable to say what she was doing when struck. This witness said that there was "ample room to stand if you were thinking about what you were doing," and his safety demonstrated the truth of his statement.

Plaintiff had no recollection of what she was doing or where she was standing at the time. It does not appear that she was deficient in intellect, and she ought to have seen the car and exercised her thought, as did her witness. *Edgerton* v. *Baltimore & O. R. Co.* 6 App. D. C. 516, 523; *Harten* v. *Brightwood R. Co.* 18 App. D. C. 260, 265; *Barrett* v. *Columbia R. Co.* 20 App. D. C. 381, 390; *Stewart* v. *Washington & G. F.*

*Electric R. Co.* 22 App. D. C. 496. See also *Miller* v. *St Paul City R. Co.* 42 Minn. 454, 44 N. W. 533. The facts of that case are almost identical with those shown in this record; what little difference there is made that, if anything, more favorable to the plaintiff. The defendant had permitted the practice of entering the cars from the space between the tracks which was paved, while the other side was not, and yet there were but 2 feet of clear space between passing cars. Moreover, the grip-man of the cable car which ran down the plaintiff testified that he saw the plaintiff in the point of danger, and did not moderate the speed of his car. The appellate court reversed a judgment for the plaintiff on the ground that there could be no other reasonable conclusion than that his own negligence was the cause of his injury.

Being of the opinion that the trial court was right in directing the verdict upon the ground of the plaintiff's contributory negligence, the judgment will be affirmed with costs. It is so ordered.                                    *Affirmed.*