Ray DELZER and Betty Jean Delzer, Plaintiffs and Appellants,

v.

UNITED BANK OF BISMARCK, Defendant and Appellee.

Civ. No. 910304.

Supreme Court of North Dakota.

April 24, 1992.

Ray H. Walton (argued), and Anderson & Anderson, Bismarck, for plaintiffs and appellants; argued by Sonna M. Anderson.

Wheeler Wolf, Bismarck, for defendant and appellee; argued by David L. Peterson.

MESCHKE, Justice.

For the second time, Ray and Betty Jean Delzer appeal a summary judgment dismissing their action against United Bank of Bismarck for breach of a claimed oral agreement to extend additional credit to them. We again reverse and remand for trial.

The Delzers owned and operated a 2,050 acre ranch northeast of Bismarck. Over the years, they borrowed operating funds from local banks. During the summer of 1979, the Delzers borrowed $60,000 from United. In September, they spoke to United officers about additional operating loans.

At first the Delzers requested a $150,000 operating loan from United, they say. They submitted a farm plan that projected income and expenses for several years, with current hay inventory and future hay sales to secure that loan. According to the Delzers, United would not increase their loan without all of their ranch assets as

security. The Delzers claim that they refused to pledge all of their assets as security unless United assured them of additional credit of $122,500 to purchase cattle.

The Delzers then proposed a $300,000 loan that United accepted, they say. The Delzers claim that United officers orally agreed to a $300,000 line of credit, as confirmed by written comments of United officer Ron P. Keeley on October 15, 1979, in the Delzers' loan file at the bank:

> Today discussed the application of Ray Delzer for a $300,000.00 revolving farm line. Directors present were Frank Bavendick and Bob Woodmansee together with Rick Hurdelbrink and Ron Keeley. Both directors felt we should go ahead based on machinery, equipment, and real estate collateral.
>
> We have obtained cash flow statements and various other projections. We expect this to be minimum five year project as the major purpose is to finance a herd of cows which he will dry lot. . . .
>
> \*    \*    \*    \*    \*    \*
>
> We will require a Security Agreement on machinery, equipment and a 2nd real estate mortgage and a collateralized guaranty from his son to tie up all farm assets.

On November 1, 1979 the Delzers executed a credit agreement with United and signed a promissory note for $150,000. As collateral, United obtained security agreements on all of the Delzers' machinery and equipment, a second mortgage on their real estate, and a guaranty from their son, all consistent with the comments in United's loan file on October 15, 1979.

The credit agreement specifically incorporated a cash flow projection (PCA Form 316) that the Delzers argue was the projection for a $300,000 loan, but that the Bank says was the projection for a $150,000 loan. This agreement said that the loan balance would not exceed $150,000 at any time during the loan period. The credit agreement also stated that the Delzers agreed to apply all the proceeds from livestock to reduce any outstanding indebtedness, and that failure to do so would be a default.

Because cattle were a planned part of the operation to service this debt, the Delzers say, they later asked United for the funds to purchase the cattle that they expected to add through the credit agreement. United refused to advance any amount beyond the $150,000 loan.

As a result of United's alleged breach of the claimed agreement to loan them up to $300,000, the Delzers argue that they were unable to pay their debts. The Delzers' ranch failed and they lost their property. The Delzers then sued United for breach of the alleged agreement to extend additional credit to them.

United responds that the only agreement with the Delzers was for the $150,000 loan, and that the documents signed on November 1, 1979, reflect United's total commitment to the Delzers. United emphasizes one sentence in the agreement: "BORROWER acknowledges that at no time during the loan period will the loan balance exceed One Hundred Fifty Thousand and no/100 ($150,000.00) Dollars." United argues that this sentence made the loan documents fully integrated, and thus limited its obligation to the Delzers to a maximum loan of $150,000. Even if there was an oral agreement to loan the Delzers $300,000, United argues that the parol evidence rule excludes evidence of it, and that the statute of frauds bars enforcement of it.

United moved for summary judgment. After some hesitation, the trial court granted summary judgment to United, reasoning that "the claimed agreement here, even if one existed, is not enforceable." We reversed. *Delzer v. United Bank of Bismarck*, 459 N.W.2d 752 (N.D.1990) [*Delzer I*]. We concluded that the statute of frauds, NDCC 9–06–04(1), did not bar the suit because the asserted oral agreement was capable of being completed within one year. *Id.* We also concluded that the credit agreement was ambiguous and not clearly integrated, leaving a genuine issue of material fact about whether United agreed to supply the Delzers with additional credit up to $300,000 for purchasing cattle. *Id.* In addition, we concluded that there was sufficient evidence in the record, particular-

ly the cash flow projections submitted by the Delzers to United, for reasonable inferences about terms of the alleged oral agreement. *Id.* We remanded for trial.

After remand, Ray Delzer, acting as his own attorney, began another action against United in federal court. This qui tam action alleged that United defrauded Farmers Home Administration by encouraging FHA to make a subordinated loan to the Delzers in 1981, and by improperly manipulating application of repayments on the several loans.[1] During discovery in the qui tam action, United deposed Ray Delzer. Although another lawyer was present to consider representing Delzer, Delzer was unrepresented by counsel at the deposition, and has since proceeded as his own counsel in that qui tam action.

During this deposition, counsel for United questioned Ray Delzer about a recently discovered letter, dated October 30, 1979, from Delzer to Northwestern National Life Insurance Company, the first mortgagee of the Delzers' ranch land. The letter said that the Delzers had decided to operate a small grain farm without cattle, and with a $150,000 line of operating credit from United. The letter confirmed that United's security for this credit would be a first mortgage on their hay and equipment, and a second mortgage on the Delzer's real estate, almost the same security executed two days later on November 1, 1979. The letter stated that a cattle operation would require more capital investment, and would place the Delzers in no better position, than a small grain operation. The letter said, "We have tore up our alfalfa lands, deep toolbar[r]ed them twice and irrigated the plowed land to recharge the soil profile. We are all set to do a good and timely job of farming next year."

Arguing that this letter "clearly shows all Delzers' claims are baseless," United again moved for summary judgment. The motion was based "upon subsequently dis-

covered information," including the letter and Ray Delzer's testimony in the qui tam deposition. The Delzers resisted, including an additional affidavit by Ray Delzer that asserted:

> On November 1, 1979, when we met with Bank officials, I was advised that any loan commitment was conditioned upon receipt of the collateral outlined in the Bank's October 15, 1979. We then proceeded to close the loan on the basis of the previously agreed to cattle plan.

The trial court wrestled with this motion.

The trial court first disagreed, "as a matter of law," with this court's conclusion in *Delzer I* that including livestock and "proceeds of livestock" as security made the credit agreement ambiguous. The trial court understood that, "[w]hile this court may disagree with the opinion, the finding of ambiguity made by the Supreme Court is the 'law of the case' and the trial court is bound by the appellate finding of ambiguity." Still, the court decided that the letter was "newly discovered" evidence that changed the position of the case enough to permit reevaluation of the evidence for interpreting the ambiguity in the credit agreement.

Reasoning that extrinsic evidence may affect the meaning of ambiguous language in a contract, the trial court held that the effect of the October 30 letter was "undisputed and conclusive" except for conflicting testimony from Ray Delzer himself. The court accepted that the credibility of a witness cannot be weighed for summary judgment, ordinarily. But yet the court ruled that a party resisting summary judgment need not be believed if that person's testimony late in the discovery process contradicted that person's earlier testimony.

Citing precedent "[o]n the strength of this rule," the trial court characterized Delzer's testimony in the qui tam deposition as an "attempt to reshuffle the sequence of

---

1. Qui tam "is an action brought by an informer, under a statute which establishes a penalty for the commission or omission of a certain act, and provides that the same shall be recoverable in a civil action, part of the penalty to go to any person who will bring such action and the re-

mainder to the state or some other institution. It is called a '*qui tam* action' because the plaintiff states that he sues *as well* for the state as for himself." Black's Law Dictionary 1251 (6th ed. 1990).

events with testimony or evidence that the claimed oral agreement with the bank was made or even continued sometime between October 30 and November 1...." The court refused to consider Ray Delzer's testimony, reasoning:

> The letter is decisive. Mr. Delzer obviously knew two days before execution of the contract what the agreement was with [United]. While there is a fact dispute as to whether the bank made an oral offer for a cattle operation between October 30 and November 1, which was agreed to by the [Delzers], that evidence is excluded because of its contradictory nature.
>
> \*   \*   \*   \*   \*   \*
>
> Mr. Delzer's letter removes any ambiguity of the meaning of the words of the contract.

The trial court again entered summary judgment dismissing the Delzers' action against United.

Because United had pending counterclaims against the Delzers for fraud, misrepresentation, and abuse of process, the Delzers requested a NDRCivP 54(b) certification of the summary judgment. The trial court ruled that there was no just reason for delay, and directed entry of a final judgment dismissing the Delzers' action against United.

On appeal, the Delzers argue that the trial court improperly entered summary judgment, and that the trial judge should be disqualified for bias. Specifically the Delzers argue that the credit agreement remains ambiguous now as before, and therefore the "law of the case" requires the trial court to follow *Delzer I. See Newman Signs, Inc. v. Hjelle*, 317 N.W.2d 810, 814 (N.D.1982). We agree that *Delzer I* controls this appeal.

In *Delzer I*, 459 N.W.2d at 757, we said that "the November 1st line of credit agreement does not contain such a clear, unambiguous written statement of the parties intent" as found in *Tkach v. American Sportsman, Inc.*, 316 N.W.2d 785, 788 (N.D.1982). In *Tkach*, the lease agreement declared "[t]hat this lease constitutes the whole and complete agreement reached by and between the respective parties hereto." Without a like declaration, and within a context of security in livestock and the proceeds of livestock, United's credit agreement with the Delzers is still ambiguous about additional financing for cattle purchases.

As a separate document, the October 30 letter does not change the ambiguity of the credit agreement. Nor does the letter completely eliminate the possible inference from other circumstances of a separate oral agreement for more credit. As the trial court was aware, the letter is only another piece of extrinsic evidence for interpreting the ambiguity. Doubtless, the letter has some effect on the credibility of the Delzers' claim of a different oral agreement, but the letter does not foreclose that possible inference.

This complex case covers a long period of time and presents a number of questions. The parties have widely divergent views about the meaning and circumstances of a credit agreement made more than ten years ago. United maintains that the discovery of the letter, when considered with Ray Delzer's contradictory testimony in the qui tam deposition, demonstrates Delzer's lack of credibility. United argues that, because this letter was written only two days before the credit agreement, the letter must describe the only possible agreement between the parties.

However, the Delzers contend that the letter's references to farming were simply contemplations about an alternative plan that was under consideration together with the plan for operating with cattle, up to the moment that the credit agreement was completed. Thus, the Delzers insist, the letter cannot be conclusive.

In *Delzer I*, we ruled that there were genuine issues of material fact about the meaning of the credit agreement and about whether there was a separate oral agreement between United and the Delzers for additional credit. The newly discovered letter, however awkward for the Delzers to explain, is only one more item of extrinsic

evidence to be weighed by the finder of fact.

The analysis in *Delzer I* about the ambiguity and the lack of completeness of the credit agreement remains unaffected.

In particular, there are several facts that lend credence to the Delzers' position. Initially, the October 15, 1979, bank comments state that the directors present at the meeting believed that United should go ahead with the $300,000 revolving farm line for the Delzers. The comments indicate that in order for the bank to loan the Delzers this amount, the bank would require a security agreement on machinery, equipment and a second real estate mortgage and a collateralized guarantee from the Delzers' son to tie up all farm assets. However, in the bank comment file of November 7, 1979, the bank recognizes the November 1, 1979, $150,000 operating line and then proceeds to state that "we have taken a blanket security agreement on all machinery and equipment and a second real estate mortgage as discussed in our comments of 10/15/79." Ray Delzer, via deposition, stated that he and his wife were unwilling to pledge all of their farm assets to United without the assurance of an additional loan to enable them to purchase livestock. Viewing the information in a light most favorable to the Delzers, as we must on appeal from a summary judgment, we believe reasonable inferences can be drawn that United may not have required all the security necessary for the $300,000 revolving farm line, per United's loan comments, if the only loan that United intended to make to the Delzers was the November 1st $150,000 line of credit agreement. Further, reasonable inferences can be drawn that the Delzers would not have signed the $150,000 line of credit agreement if United had not assured them of additional money for the purchase of cattle.

Additionally, the November 1st line of credit agreement specifically refers to the proceeds from the sale of livestock. However, both United and the Delzers agree that without the additional monies from the alleged oral agreement, the Delzers were unable to purchase any livestock whatsoever for their ranching operation. It appears to be inconsistent that United would refer to the proceeds of livestock in the $150,000 line of credit agreement if, in fact, they did not intend to advance the additional monies to the Delzers to enable them to purchase the livestock.

Finally, we note that the November 1st line of credit agreement clearly incorporates a cash flow projection (PCA Form 316) which was prepared by the Delzers. The Delzers provided United with two separate cash flow projections. One projection entailed a borrowing of $300,000 from the bank with hay and livestock to be used as collateral. The other cash flow projection, for $150,000, provided that the only available collateral would be the Delzers' existing hay inventory. There is a dispute between the parties as to which cash flow projection was submitted to the bank for purposes of issuing the November 1st line of credit agreement. If in fact the Delzers are correct in that the $300,000 cash flow projection was what United based the line of credit agreement upon, it would appear that United intended to provide them with an additional line of credit so that they would be able to purchase the livestock which were referred to in the November 1st line of credit agreement.

*Delzer I*, 459 N.W.2d at 756–57 (footnote omitted). These available inferences are not excluded by the extrinsic evidence of the letter.

The trial court convinced itself that the letter eliminated other inferences by rejecting Ray Delzer's deposition testimony and his affidavits as too contradictory for belief. United says that severe inconsistencies between Ray Delzer's earlier positions and his later testimony make his evidence incredible. The court ruled that a party cannot vary his testimony to defeat a motion for summary judgment. The Delzers argue that this view should not apply here because Ray Delzer's statements in his affidavit resisting the renewed motion for

summary judgment are consistent with his prior testimony, not contradictory.

The Delzers urge that the only possible contradiction is what the trial court inferred from Ray Delzer's deposition in the qui tam action about the timing of his discussions with Chris Yegen, one of the Delzers' hay customers, about future hay sales before the credit agreement was executed on November 1. The Delzers urge that this deposition should not be considered because it was only a fragment of the facts, was taken without the presence of counsel for the Delzers, and was obtained by unethical conduct of counsel for United inquiring about the subject matter of this lawsuit, rather than about the separate qui tam lawsuit.[2] United responds that the qui tam deposition was not obtained in violation of ethical rules because the Delzers' attorneys in this case knew about the scheduled deposition and chose not to attend. This argument doesn't matter. The Delzers did not object below to the use of this separate deposition for the summary judgment motion.

■ An objection cannot be made for the first time on appeal. *Kilzer v. Binstock*, 339 N.W.2d 569, 572 (N.D.1983); *First National Bank & Trust Company of Williston v. Jacobsen*, 431 N.W.2d 284, 287 (N.D.1988). Therefore, we decline to rule on the question of the use of the qui tam deposition for the summary judgment motion. On remand, the trial court will be able to make a factual record about the taking of that deposition, and then will be in a better position to decide about its admissibility as evidence at the trial.

Suffice to say here, we do not read Ray Delzer's testimony in the qui tam deposition to seriously contradict his prior testimony about the time of discussions with Chris Yegen before executing the credit agreement. Looking back ten years, some confusion about the sequence of undocumented events may be expected. *See*

*Kennett–Murray Corp. v. Bone*, 622 F.2d 887, 893 (5th Cir.1980). There are no doubt cases where contradictions in a party's discovery testimony will result in summary judgment because they are so extreme or farfetched as to be unbelievable. *See* NDRCivP 56(g). For some examples, *see Guardian State Bank v. Humpherys*, 762 P.2d 1084 (Utah 1988); *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361 (8th Cir.1983); *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572 (2d Cir.1969). This is not such a case.

■ Summary judgment is a convenient procedure to expedite a lawsuit without a trial on the merits when there is no real dispute about the facts. *Industrial Commission of North Dakota v. Wilber*, 453 N.W.2d 824, 825 (N.D.1990). Unfortunately, the trial court's repeated efforts to avoid a trial of this dispute have achieved greater delay, not expeditious disposition.

■ In reviewing a summary judgment, we view the evidence in the light most favorable to the party opposing the summary judgment motion, and we allow that party all favorable inferences. *Wilber*. The party seeking summary judgment has the burden of showing that no genuine issue of material fact exists. *Id.* The trial court, too, must consider the pleadings, admissions, affidavits, depositions, and interrogatories, as well as all possible inferences therefrom, in the light most favorable to the party opposing summary judgment. *Delzer I*, 459 N.W.2d at 755. When this record is looked at in that way, the same questions of fact persist after Ray Delzer's October 30 letter is taken into account as an item of extrinsic evidence. Therefore, we remand for trial.

■ The Delzers argue that the trial judge should be removed from this case because he improperly weighed the credibility of Ray Delzer and is therefore obviously biased against them. The Delzers urge that because the trial judge "found contra-

---

**2.** North Dakota Rules of Professional Conduct, Rule 4.2 says:

In representing a client, a lawyer shall not communicate *about the subject of the representation* with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so. (Our emphasis).

dictions in Delzer's testimony where none exist," the judge can no longer be impartial. We are not convinced.

Under the North Dakota Rules of Judicial Conduct, Rule 3(C)(1), "[a] judge's disqualification is appropriate when the judge's impartiality might reasonably be questioned, ..." We understand that the trial court inappropriately questioned Ray Delzer's credibility in considering a summary judgment motion. But that kind of an isolated error of law does not automatically disqualify a trial judge as biased. Furthermore, the failure to raise the question of judicial bias in the trial court ordinarily precludes our review of that question on appeal. *See Wenzel v. Wenzel*, 469 N.W.2d 156, 158 (N.D.1991). As we said in *Slaubaugh v. Slaubaugh*, 466 N.W.2d 573, 583 (N.D.1991), "[w]e will not automatically grant a request for a change of judge based upon unproved allegations of bias or prejudice, although we do not preclude the trial court from considering such a request upon remand."

We again reverse the summary judgment, and we again remand this case for trial.

ERICKSTAD, C.J., VANDE WALLE, J., and BRUCE BOHLMAN, District Judge, concur.

BRUCE BOHLMAN, District Judge, sitting as a member of the Court to fill the vacancy created by the resignation of GIERKE, J.

JOHNSON, J., not being a member of this Court at the time this case was heard, did not participate in this decision.

LEVINE, Justice, dissenting.

I would affirm summary judgment against the Delzers and so I respectfully dissent.

I disagree that *Delzer I*, in which we found ambiguity, is controlling. How can it be, when the record we examined in *Delzer I* did not include Mr. Delzer's letter of October 30, 1979, which on its face, dispels any ambiguity about the terms of the parties' November first credit agreement?

The question in *Delzer I* was how much money did the Bank agree to lend Delzer: $150,000.00 or $300,000.00? The Bank's loan comments said $300,000.00, but the promissory note and final agreement indicated $150,000.00. Ambiguous? Yes! But if we had had Mr. Delzer's unembellished admission that the deal struck between him and the Bank would:

> "[G]enerate $336,000.00 over the next three years allowing us to operate completely on our own and also generate enough money to allow us to invest in cows later on with our own money should conditions justify it. The bank that we are doing business with is the State Bank of Burleigh County. *The line of credit is for $150,000.00 with a projected peak of $133,000.00 in July of 1980 as indicated in the cash flow projection* and a pay-off in October through December depending on marketing." (Emphasis added.)

Would we have found any ambiguity? I wouldn't have.

We decide ambiguity as a matter of law. In *Delzer I*, we were confronted with the conflict between the loan comments and the final credit agreement and promissory note. Delzer maintained that the Bank had agreed to a $300,000.00 loan commitment on or before October 15, 1979. Had we been privy to Delzer's October 30, 1979 letter, which expressed his clear understanding of the terms of the agreement he in fact struck with the Bank after October 15, we would have had no doubt about the terms of the final agreement. Delzer himself made those clear beyond question.

Furthermore, even if I am the only one who would have decided *Delzer I* differently had Delzer's letter been part of the record, I am still convinced that summary judgment should be affirmed. Litigation is not an inconsequential undertaking and it ought to be short-circuited when it is predictable that reasonable people could not disagree that the result of that litigation will favor the Bank. *See Johnson v. PCA of Fargo*, 345 N.W.2d 371 (N.D.1984). How can reasonable people overlook Del-

zer's unequivocal, unambiguous statement in his letter describing the agreement? I believe the evidence does not present sufficient disagreement to require it to go to a jury and even if it does, with the letter, it is so one-sided that the Bank must prevail as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matter of Estate of Stanton,* 472 N.W.2d 741, 747 (N.D.1991) (Levine, J., concurring).

Even the majority agrees that weighing credibility in the face of an admission against interest by the plaintiff is appropriate when the plaintiff tries to later change his story. *See Guardian State Bank v. Humpherys,* 762 P.2d 1084 (Utah 1988), and other cases cited by the majority. I agree with the trial court that this is precisely such a case.