Ricky L. **REEMS** and Linda Reems, on behalf of their daughter, Beth Reems, Plaintiffs and Appellants,

v.

**ST. JOSEPH'S HOSPITAL AND HEALTH CENTER, and Rodgers & Gumper Clinic, P.C., Defendants and Appellees.**

Civ. No. 940333.

Supreme Court of North Dakota.

Aug. 29, 1995.

William P. Zuger (argued), Zuger Law Offices, Bismarck, and Stephen D. Little, Dietz & Little, Bismarck, for plaintiffs and appellants.

Paul G. Kloster (argued), and Michael C. Waller, Mackoff, Kellogg, Kirby & Kloster, PC, Dickinson, for defendant and appellee St. Joseph's Hosp. and Health Center.

Lance D. Schreiner (argued), and Brenda L. Blazer, Zuger, Kirmis & Smith, Bismarck,

for defendant and appellee Rodgers & Gumper Clinic, P.C.

VANDE WALLE, Chief Justice.

Ricky and Linda Reems, on behalf of their daughter, Beth Reems, appealed a judgment on a jury verdict in the district court, Southwest Judicial District, finding St. Joseph's Hospital & Health Center and Rodgers & Gumper Clinic, P.C., free of any negligence which could have proximately caused Beth's injuries. We affirm.

Anticipating the delivery of her fourth child, Linda Reems checked into the emergency room of St. Joseph's Hospital in Dickinson, North Dakota on December 31, 1982, at 6:40 p.m. She was experiencing contractions two to three minutes apart. At that time it was decided that, in order to save an extra day's hospital expense, Linda would wait until after midnight before being admitted to the hospital. Her doctor apparently permitted this arrangement if Linda stayed in Dickinson and did not return to her home in Killdeer. The Reemses visited a relative in the hospital, "went to a drive-up" for a burger, and drove around looking at Christmas lights. They returned to the hospital around 8:30 p.m. and sat in the "OB waiting room" to wait for midnight to arrive.

Linda Reems was admitted to the hospital at 12:02 a.m. on January 1, 1983. Her doctor was notified of her admission at 12:05 and arrived at the hospital at 12:18. Beth Reems was born at 12:39 a.m.

At birth Beth exhibited some cyanotic condition. She was placed in an Isolette and administered thirty percent oxygen. The records of attending nurses reflect that her condition improved. Linda Reems testified at trial that her memory of the blueness in Beth's appearance conflicts with the records of the nurses and that she was deeply concerned about Beth's condition. When Beth was released from the hospital five days later, Linda was still concerned about her condition. However, the hospital records do not reflect the same concern among Beth's care givers and, according to testimony of hospital personnel and several expert witnesses, there was no apparent cause for concern.

In late March, 1983, Beth was tested by a Bismarck doctor and was found to have severe brain damage. According to Linda Reems's trial testimony, the doctor recommended an infant-stimulation program and stated that "the goals that he would set for [Beth] in life would be to learn to smile, to sit up in a wheelchair and to be able to hold her own head."

On behalf of Beth,[1] the Reemses, in 1992, filed suit against Dr. Dennis Wolf, the attending doctor, a consulting physician, the Rodgers & Gumper Clinic, with which Dr. Wolf was a partner, and St. Joseph's Hospital. They alleged that actions and omissions by Dr. Wolf and hospital personnel directly preceding and during Beth's delivery and during the first hours of Beth's life proximately caused Beth's condition. Eventually, the Reemses dropped the claim against the two doctors and proceeded with the suit against the clinic and the hospital. The trial was bifurcated and, in the first stage of the trial, the jury was asked only to decide the liability issue.

At trial the Reemses presented evidence to support their theory that a moderate meconium aspiration combined with a mild asphyxia suffered during the birth process to cause Beth's injuries. They argued that the seriousness of Beth's condition was underappreciated by the attending professionals and, therefore, Beth was not given the appropriate care. The defense countered with experts who testified that the doctor's and nurses' notes reflect a fairly ordinary delivery and aftercare which were well within the contemporary professional standards. Defense experts also testified that Beth's brain injuries could not have been caused as the Reemses alleged. In their opinion, the injury occurred some weeks prior to delivery.

During pretrial and during trial, the Reemses requested that Beth be allowed to attend the proceedings. The trial court decided that her "pathetic" appearance would

---

1. Any claims that Beth's parents may have pursued on their own behalf were by this time barred by statutes of limitations.

be a "distraction" and that under rule 403, N.D.R.Evid., she would be excluded. The court did, however, leave open the possibility that it would modify this ruling if Beth's appearance would provide evidence relevant to some expert testimony. At one point during trial, the Reemses moved to have Beth appear in order to counter a defense expert's reference to her having "peg" teeth. This motion was denied.

Just before the noon hour of the second day of jury deliberations, the jury sent the judge a note asking for a definition of proximate cause. The word "proximate" was underlined. After consulting with the attorneys, the trial judge responded with: "For now, I can only ask you to refer back to the definition of proximate cause given to you starting near the bottom of page 12 of the Jury Instructions. If I am able to give you additional help, I will provide that shortly after your lunch is completed." The jury returned with the verdict about three quarters of an hour after receiving the judge's response.

Several weeks after trial, the Reemses were made aware of a newspaper advertisement promoting the reelection campaign of the trial judge. The advertisement, in the July 16, 1994, issue of the Dunn County Herald, listed the lead attorney for St. Joseph's Hospital as a finance co-chair of the judge's reelection committee. It also listed Dr. Harlan C. Larsen as an advisor to the reelection campaign. The Reemses recognized Dr. Larsen as an associate of Dr. Wolf, the physician who attended at the birth of Beth Reems, and as someone they had seen observing the trial in the company of Dr. Wolf's wife. On August 24, 1994, the Reemses filed a motion under rule 60(b)(vi), N.D.R.Civ.P., to vacate the judgment and order a new trial with a different judge. They argued that the "relationship between the presiding judge[,] the defendant[,] and defendant's counsel, required the trial judge to recuse himself" or "[a]t an absolute minimum, such a breach can allow the presiding judge to continue to preside only upon the execution of a written waiver, signed on behalf of all parties by all counsel to the proceeding." The judge denied the motion in a written memorandum to all the attorneys which is dated December 13, 1994.

I.

On appeal the Reemses contend that the trial court's exclusion of the plaintiff, Beth Reems, was reversible error. Ordinarily, allowing the presence in the courtroom of those children who are parties to the action will not be an abuse of discretion. *Bartholomay v. St. Thomas Lumber Co.*, 148 N.W.2d 278 (N.D.1966). Due process and the right to a fair trial ordinarily preclude courts from excluding those parties who are able to understand the proceedings and to assist counsel in the presentation of their actions. *E.g.*, *Helminski v. Ayerst Lab., Div. of Am. Home Prod. Corp.*, 766 F.2d 208, 217 (6th Cir.1985) [recognizing that "under limited circumstances a party's involuntary exclusion might be justified"]. However, courts must have the ability "to provide all parties with a fair trial." *E.g.*, *id.* Thus, a trial court has broad discretion to decide whether other parties may be present. *Bartholomay*, *supra.*

In a case with facts similar to this one, the Oregon Supreme Court adopted

> "the standard that a plaintiff who is unable to comprehend, meaningfully participate in the proceedings, or assist his or her lawyer in the presentation of a case may be excluded from the liability portion of a bifurcated trial if the trial court, in the exercise of informed discretion, determines that the party's presence would be unfairly prejudicial. . . . [T]he preferred method is for the trial court to hold a formal hearing and personally view the party before it makes a ruling on whether to exclude that party from the liability phase of trial."

*Bremner v. Charles*, 312 Or. 274, 821 P.2d 1080, 1086 (1991). *See also* Francis M. Dougherty, Annotation, *Physical Condition of Plaintiff in Personal Injury Action as Affecting Right to be Present at Trial*, 27 A.L.R.4th 583 (1984).

The *Bremner* court noted that there was "nothing in the record about how [the plaintiff's] personal presence in the courtroom could have aided the jury in determining whether defendants were negligent and, if so,

whether that negligence caused [the] injuries." 821 P.2d at 1086. *See also Helminski*, 766 F.2d at 217 ["Exclusion of a party from the damages portion of the proceedings is, however, inappropriate."]. The *Bremner* court also noted that the plaintiff was represented and his interests were protected by his mother and his attorney. 821 P.2d at 1086. *See also, Dickson v. Bober*, 269 Minn. 334, 130 N.W.2d 526, 530 (1964) ["The rights of [the] plaintiff were protected by the general guardian who brought the action for him and by the attorney selected to represent his interests during the trial."].

Beth Reems was excluded from the courtroom only after the trial court viewed "a day in the life of . . ." video of her, decided that her presence would be "distracting" and prejudicial to the defense, and further concluded that her appearance lacked relevance to the liability portion of the bifurcated trial. Even then the court left open the possibility of admitting her to the courtroom when and if her appearance became relevant. The trial court acted well within its discretion.

## II.

The Reemses next invite us to find error in the trial court's proximate-cause instruction to the jury. We review jury instructions as a whole and if they fairly and adequately reflect the applicable law and no part of the instructions would confuse or mislead an average jury, we will not reverse. *Beilke v. Coryell*, 524 N.W.2d 607 (N.D.1994).

The jury was given the same standard instruction that was at issue in *Beilke, supra*.[2] In that case we recognized that a party is entitled to an instruction that allows it to present its theory of the case if justified by law. We found nothing in the record to indicate to us that the jury instruction in any way inhibited the presentation of the Beilkes'

theory of the case. The same is true here. The Reemses were in no way inhibited by the proximate cause instruction from presenting evidence and argument to support their claim that negligence surrounding the birth of Beth proximately caused her injuries. Instructions undoubtedly can be improved upon but that does not make them erroneous. We adhere to our decision in *Beilke* concerning this instruction.

Although the Reemses ask us to distinguish *Beilke* on the ground that that case did not involve a jury request for a definition of proximate cause, we decline their invitation. To do so would necessitate an attempt to read the collective mind of the jury, a task we will not undertake.

## III.

The Reemses also argue that the trial court erred when it denied their motion for relief under rule 60(b)(vi), N.D.R.Civ.P. They argue that the failure of the trial judge to disclose the relationship of the hospital's attorney and clinic's partner to his reelection campaign was reversible error.

Rule 60(b)(vi), N.D.R.Civ.P., gives the trial court discretion to set aside a final judgment for "any . . . reason [not already listed in the rule] justifying relief from the operation of the judgment." We will not reverse a 60(b)(vi) ruling absent an abuse of discretion. *E.g., First Nat'l Bank of Crosby v. Bjorgen*, 389 N.W.2d 789 (N.D.1986).

Canon 5(C)(2), N.D.C.Jud.Cond., governs and guides the behavior of those seeking judicial office. The commentary to canon 5(C)(2) states: "Though not prohibited, campaign contributions of which a judge has knowledge, made by lawyers or others who appear before the judge, may be relevant to disqualification under Section 3E." Although

---

**2.** The final instructions to the jury, under the heading "Definition of Proximate Cause," read as follows:

"Before a person can be held responsible for negligence, such negligence must have been a proximate cause of the injury complained about.

"A proximate cause is a cause which, in natural and continuous sequence, produces the injury and without which the injury would not

have occurred. It is a cause which had a substantial part in bringing about the injury either immediately or through happenings which follow one another.

"There may be more than one proximate cause of the injury. The fault of two or more persons may contribute to cause the injury and in such a case each person's fault is regarded as a proximate cause."

there is no evidence in this case that the trial judge had knowledge of actual contributions, it is evident he was aware that the lead attorney for the hospital in the proceeding before him was to be his finance co-chair when active campaigning was to begin after trial. Canon 3(E) requires disqualification of a judge from "a proceeding in which the judge's impartiality might reasonably be questioned." We do not decide whether in this particular case the trial judge's relationship to the attorney of a party before him or to a partner of a party before him gives reasonable cause to question his impartiality.

▮ · Rule 21 of the North Dakota Rules of Judicial Conduct Commission governs the types of action which that commission may take in order to remedy a violation of the Code of Judicial Conduct. That rule states that "[i]f the Commission finds good cause, it shall recommend to the Supreme Court the censure, removal, retirement, suspension, or other disciplinary action against the judge." Understandably the Code of Judicial Conduct does not specify reversal as a remedy in a case in which a canon was violated.

The Reemses rely on *Sargent County Bank v. Wentworth*, 500 N.W.2d 862 (N.D. 1993), to argue that the mere appearance of bias by the trial court requires reversal. However, *Wentworth*, a case in which we recognized that a violation of the judicial conduct rules by a presiding judge may result in the reversal of a judgment, involved a bench trial in which the credibility of the parties was crucial in resolving the litigation. In *Wentworth*, credibility and other fact issues were decided by the court and not by a jury. Noting very difficult factual issues in *Wentworth*, we stated:

"Despite these difficulties, [the trial judge] ruled in favor of the Bank, adopting virtually all of its explanations for its actions and reasoning that these actions caused the Wentworths no harm. Although [the judge]'s findings are supported by some of the evidence in the record,

there is conflicting evidence that could also support contrary findings on many of the factual questions."

*Id.* at 879.

Given the complexity of the factual issues which faced the trial judge in *Wentworth*, we concluded that his "unintentional entanglement" in an unrelated matter in which he was represented by a member of the law firm representing the bank could cause a reasonable person to reasonably question the judge's impartiality. *Id.* at 879. Thus, we found that disqualification was required under rule 3(C) of the North Dakota Rules of Judicial Conduct.[3]

This case is distinguishable from *Wentworth* in that questions of fact and the credibility of evidence were decided by a jury. The trial judge made several decisions involving the evidence which was presented to the jury, but these decisions and other matters of law are a part of the record. Thus we are able to review the record for instances of actual bias.

▮ Although the Reemses point to several decisions of the trial court with which they do not agree and which they consider evidence of actual bias, adverse rulings are not alone evidence of partiality. *E.g., Matter of Norman*, 524 N.W.2d 358 (N.D.1994). Our review of the record reveals that the trial judge weighed issues very carefully before deciding on motions and other matters.

Contrary to the Reemses' allegations, the record shows that the trial judge conducted a fair trial in which all of the parties were able to fully present their evidence and arguments to the jury. The trial court's denial of the rule 60(b)(vi), N.D.R.Civ.P., motion was not an abuse of discretion.

We affirm.

SANDSTROM and NEUMANN, JJ., concur.

---

3. On January 1, 1994, the Rules of Judicial Conduct were replaced by the current North Dakota Code of Judicial Conduct. N.D.Code Jud. Cond.Rule 3(C)(1) of the old Rules of Judicial Conduct stated that "disqualification is appropriate when the judge's impartiality might reasonably be questioned." The current canon 3(E)(1) requires disqualification in the same instance. Because the *Wentworth* decision read the language of the old rule as mandatory and not merely guidelines, we need not concern ourselves with the difference in language.

LEVINE, Justice, specially concurring.

I agree with the majority decision but write to memorialize my disagreement with *Sargent County Bank v. Wentworth*, 500 N.W.2d 862 (N.D.1993), which, in my view, ought to have been analyzed and decided as the majority analyzes and decides this case—that the remedy for the appearance of bias by a judge is not reversal, but "censure, removal, retirement, suspension, or other disciplinary action against the judge." Rule 21, NDRJC. Only if a judge were actually biased should her decision be reversed. There is no evidence of actual bias in this case.

I concur in all of the opinion except the part that distinguishes *Wentworth*. I would overrule *Wentworth*, not distinguish it, to the extent *Wentworth* requires reversal of a judgment in a trial where "the record shows beyond question that [the judge] fairly tried [the] case." *Wentworth, supra* at 880.

MESCHKE, Justice, dissenting.

I respectfully dissent. I would reverse the denial of the Reemses' 60(b)(vi) motion for relief and remand for reconsideration of that motion by a new trial judge, one untainted by any question of impartiality or self-interest.

I understand the majority reviews this record for any instance of actual bias by the trial judge, concludes "the trial judge weighed issues very carefully before deciding on motions and other matters," and therefore concludes that the trial judge's denial of the Reemses' 60(b)(vi) motion for relief from the jury verdict and judgment was not an abuse of discretion. With an abridged analysis, the majority chooses not.to decide "whether ... the trial judge's relationship to the attorney of a party before him ... gives reasonable cause to question his impartiality." Because factual questions were decided by the jury, and not by the trial judge, and because "the Code of Judicial Conduct does not specify reversal as a remedy in a case in which a canon was violated," the majority leaves any remedial action for discipline of the judge through the Judicial Conduct Commission, without considering the effect of potential partiality on the fairness of the trial.

I would consider more context. Nearly a year before the trial, by a July 8, 1993, letter to Judge Hunke and copied to adverse counsel, the Reemses "ask[ed] that this Court recuse itself from further proceedings" because of "concern over the Court's partiality." The Reemses complained: "[D]efense counsel [has been] allowed apparently unlimited latitude" by being "allowed to conclude the depositions of all of the plaintiff's liability experts, without yet being required to name a single trial expert," since the case was begun in December 1991; the judge made "unfair and impertinent comment" "toward ... plaintiff's counsel;" the judge "declined to convene a settlement conference" requested by plaintiff's counsel, though unopposed by the Clinic and unresponded to by the Hospital; the court delayed setting a trial date despite Reemses' repeated requests; the judge "simply turned a blind eye to the refusal of St. Joseph's Hospital to compensate the plaintiffs' nursing expert, even though Rule 26(b)(4)(C) provides for the payment of that fee in *mandatory* terms;" all "heightened by a number of inappropriate and inaccurate comments [by the judge] upon the contents of [a discovery] file examined by the Court *in camera*." *See Reems v. Hunke*, 509 N.W.2d 45 (N.D.1993) (supervisory writ vacated discovery ordered by trial court because defendants did not demonstrate either substantial need or exceptional circumstances for work product of plaintiff's investigator). Judge Hunke did not act immediately on the Reemses' request that he recuse himself.

Soon, Judge Hunke resigned as presiding judge of his district, and the Reemses promptly asked the new presiding judge of the district by letter on July 22, 1993, to remove Judge Hunke from this case, stressing his "default ... in enforcing discovery deadlines" against defendants' counsel. The Reemses contested the defendants' assertions, in the defendants' joint response to Reemses' prior motion to disqualify Judge Hunke, "that the Court's partiality is not at issue, because the matter is a jury case." The Reemses asserted: "The manner in which the judge conducts the pretrial proceedings has a substantial impact on the outcome." The Reemses argued it was "unreasonable to expect a judge [Hunke] who

stands for reelection in the Southwest District not to be influenced by the kinds of pressures being brought in this case, whether consciously or unconsciously," an argument like one in the Reemses' July 8, 1993 letter:

> As Dickinson's largest employer, the St. Joseph's Hospital can obviously bring more influence to bear on an elected judiciary than can the plaintiffs in this case.

The Reemses asked the new presiding judge to reassign this case.

Responding to the Reemses on August 17, 1993, the new presiding judge declined to intervene, stating cryptically that "there are adequate judicial services available to maintain a current docket."

At a case management conference on September 13, 1993, Judge Hunke commented on the Reemses' motion to disqualify him. He stated: "That matter has been handled by the presiding judge, ... who has declined a request to reassign the case to some other judge, but even though there is no motion before me, [Reemses' counsel] are entitled to know my position on their letters." Judge Hunke said, "I can't take any formal action, but, quite frankly, I'm not aware of any reason why I should disqualify myself and require the case to be assigned to some other judge." The judge disclaimed any "political pressure" from St. Joseph's Hospital, and declared: "I don't intend to take any action whatsoever with regard to those letter requests [by Reemses' counsel] and will stay on the case until there is a reason that I should not be."

Later in the conference, when Judge Hunke declared, "I can't set a trial date until next summer now," and said he only intended to schedule further discovery for the next two months, Reemses' counsel demanded, "Why aren't you moving this one along?" When Judge Hunke responded, "I've done everything I can," Reemses' counsel "renew[ed] my request that you recuse yourself for failure to move this case along. You are not doing anything." Judge Hunke did not act on the renewed motion for his recusal, but he did propose a trial date for mid-June 1994 that all parties then agreed on.

Jury trial of the bifurcated issue of liability began on June 14, 1994. The jury returned its verdict on July 1, finding there was no negligence by either the Clinic or Hospital that caused injury to Beth Reems. On August 24, 1994, the Reemses moved under NDRCivP 60(b)(vi) for relief from the verdict and judgment and for a "retrial with a different district judge presiding." Reemses' counsel based the motion on the fact he

> became aware [on July 28, 1994] that both defense counsel for the Hospital herein and a physician partner of Dr. Wolf [in the Clinic], who was present throughout the trial, were on the reelection committee of the presiding judge. It was learned, particularly, that Paul Kloster was the Finance Co-chairman of the campaign[,] ... by virtue of a copy of the newspaper advertisement which had appeared in the *Dunn County Herald* on July 16, 1994, received from Linda Reems. The correspondence and a copy of the ad and Linda Reems' note accompanying the ad have all been either sent or copied to the Court, in letters from the undersigned on July 29, 1994, and August 8, 1994.

Two months later, without action on the Reemses' 60(b) motion for relief, the Reemses appealed the case on October 21, 1994. Nearly four months after the Reemses' motion for Rule 60(b) relief, Judge Hunke denied it on December 13, 1994. Judge Hunke gave his reasons:

> *This Court was well aware prior to the trial of the sensitivity involved in this issue raised by Attorney Zuger.* I was also well aware of the North Dakota Supreme Court decision in *Sargent County Bank v. Wentworth,* 500 N.W.2d 862 (N.D. 1993), which was a topic of discussion and study by trial judges in North Dakota immediately following its issuance on May 17, 1993, at least partly because of the uncertainty of what might be required of trial judges. However, my study of the Rules of Judicial Conduct and the statement by Justice Meschke at 500 N.W.2d 862, 879 that: "... if the case had been submitted to a jury, we would have no difficulty in concluding that a reasonable person would not have reasonably ques-

tioned ..." the trial judge's impartiality[,] led to *my conclusion that I had no duty to disclose to anyone the members of my re-election campaign committee. In fact, I concluded that it would be more harmful to disclose than not to disclose.*

Prior to the trial of this very serious case, I did not want to allow any opportunity that any potential juror might learn through campaign advertising (or any other disclosure) who might be members of my campaign committee, particularly when it is absolutely essential in modern judicial elections that a judicial candidate at least claimed to have the support of highly regarded and respected members of the bar and local community.

\* \* \*

In any event, the law is clear, my personal and professional conscience is clear, and the matters submitted to me on this issue make it quite clear to me that the jury verdict was not influenced in any respect whatsoever by this issue raised by Attorney Zuger.

(Emphasis added). But, disqualification for bias depends not on whether the judge believes he can preside fairly and impartially; rather, it depends on whether the litigants can reasonably question the judge's impartiality.

The North Dakota Code of Judicial Conduct makes disqualification mandatory if the judge's impartiality *"might"* reasonably be questioned:

A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer....

Canon 3E(1). The Commentary to Canon 3E(1) amplifies:

Under this rule, a judge is disqualified whenever the judge's impartiality might reasonably be questioned, regardless of whether any of the specific rules in Section 3E(1) apply.

What is more important for this case, the Commentary emphasizes that "[a] judge

should disclose on the record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no real basis for disqualification." In my opinion, Judge Hunke's failure either to disclose or to disqualify compounds the problem of perceived partiality, even if he was not actually biased.

Litigants have a right to trial of their cases before a fair and impartial judge. 46 AmJur2d *Judges* § 86 (1994). *See also* N.D. Const. art. I, § 9 ("every man for any injury done him ... shall have remedy by due process of law, and right and justice administered without sale, denial or delay").

A judicial remedy to assure the fairness of trial proceedings is not only appropriate, but is available in any appeal to correct error. A violation of the Code of Judicial Conduct that affects the fairness of a trial is not confined to a disciplinary remedy. Our precedents have so held, repeatedly. *Matter of Estate of Risovi,* 429 N.W.2d 404, 406–08 (N.D.1988) (inadvertent ethical violation by issuing judge, who had counseled party to case before becoming judge, remedied by reversal for reconsideration); *Baier v. Hampton,* 440 N.W.2d 712 (N.D.1989) (when trial judge should have recused himself for personal knowledge of disputed evidence, remedied by reversal of jury conviction for contempt); *Sargent County Bank v. Wentworth,* 500 N.W.2d 862 (N.D.1993) (reversed and remanded for new trial when trial judge inadvertently erred in failing to disqualify himself). When the judge's impartiality is reasonably questioned, remedial action on appeal is essential to assure the right to a fair trial.

The reasons for a judicial remedy to assure a fair trial have been well explained:

A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That in-

terest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that "every procedure which would offer a possible temptation to the average man as a judge ... not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." *Tumey v. Ohio,* 273 U.S. 510, 532 [47 S.Ct. 437, 444, 71 L.Ed. 749]. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would· do their very best to weigh the scales of justice equally between contending parties. But to perform its high func-. tion in the best way "justice must satisfy the appearance of justice." *Offutt v. United States,* 348 U.S. 11, 14 [75 S.Ct. 11, 13, 99 L.Ed. 11].

*In Re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955).[1] *See also* 46 AmJur2d *Judges* § 92 (1994) ("The rules providing for the disqualification or substitution of judges applies to criminal as well as civil cases where judicial functions are to be exer-.cised, whether in the lower courts or in courts of last resort."). The rule of conduct *requiring* a judge to disqualify himself when "the judge's impartiality might reasonably be questioned" has been developed not just for judicial discipline, but, as *Murchison* put it, to ensure a proceeding that can "satisfy the appearance of justice."

The duty to disqualify for perceived partiality is not limited to cases where the judge is the trier of the facts. The duty to disqual-ify, arising from a personal relationship with a party or an attorney appearing before him, mandatorily applies to any case where the judge has some discretion, even a case of purely legal questions. *See Baier v. Hampton* (jury trial); *Aetna Life Insurance Co. v. Lavoie,* 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) (state justice's participation in appellate decision on constitutional challenge to punitive damages awarded by jury trial, where justice's participation had effect of enhancing legal status and settlement value of justice's similar personal claim for punitive damages pending for trial against different company, violated appellant's rights under Due Process Clause).

The principle that a judge should perform her duties impartially, free of personal interest or bias, stems from the common law, and it is not only a mandate of the Code of Judicial Conduct, but also an aspect of due process of law. 46 AmJur2d *Judges* §§ 86, 92 (1994). Jeffrey M. Shaman et al., *Judicial Conduct and Ethics* 100 (1990), explains:

> [I]nstances of judicial preconception often are innocent in intent. Most judges genuinely believe that, despite their connections to a lawsuit, they can put aside their bias or interest and decide the lawsuits before them in a just and proper way. What this ignores, unfortunately, is that partiality is more likely to affect the unconscious thought processes of a judge than he or she may realize, with the result that the judge has little conscious knowledge of being swayed by improper influences. Fur-

---

**1.** The principle that requires the appearance of judicial impartiality is deeply embedded in our legal system:

> The argument for unreviewability in such an instance runs up against a mainstay of our system of government. Madison spoke precisely to the point in The Federalist No. 10: "No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity. With equal, nay with greater reason, a body of men are unfit to be both judges and parties at the same time...." The federalist No. 10, p. 79 (C. Rossiter ed. 1961) (J. Madison).

See *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) (Black, J.) ("[O]ur system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome."); *Spencer v. Lapsley,* 20 How. 264, 266, 15 L.Ed. 902 (1858) (recognizing statute accords with this maxim); see also Publius Syrus, Moral Sayings 51 (D. Lyman transl. 1856) ("No one should be judge in his own cause."); B. Pascal, Thoughts, Letters and Opuscules 182 (O. Wight transl. 1859) ("It is not permitted to the most equitable of men to be a judge in his own cause."); 1 W. Blackstone, Commentaries *91 ("[I]t is unreasonable that any man should determine his own quarrel.").

*Gutierrez de Martinez v. Lamagno,* —— U.S. ——, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995) (applying principle to clarify statutory ambiguity about effect of an executive determination on judicial reviewability of an injured person's claim against a government employee).

thermore, even if a judge were able to put aside bias and self-interest in a particular case, the appearance of impropriety remains, and is itself a serious problem that casts disrepute upon the judiciary.

Judicial impartiality is necessary to justice, so much so that even where a judge is in fact impartial but appears not to be, disqualification is essential. *Id.* Thus, it is a mixed question of fact and law whether the timing and extent of Judge Hunke's campaign relationship with an attorney for the Hospital on his campaign finance and reelection committees, and with a member of the Clinic on his reelection committee, makes the judge's impartiality subject to reasonable question.

Campaigning for reelection is a necessary process for an elected judge. It is not surprising that a judge invites the most active, well-known, and respected people in the community, including a leading trial attorney, to aid his reelection campaign. Campaigning compels interaction with citizens and lawyers. Still, when other trial judges are available who are not campaigning for reelection nor potentially compromised by immediate personal relationships, the choice not to disqualify nor to disclose a relationship, one that reasonably brings into question the judge's impartiality, is not an essential part of campaigning for reelection. *See* Code of Judicial Conduct, Canon 5C, and the clear warning in the Commentary: "[C]ampaign contributions of which a judge has knowledge, made by lawyers or others who appear before the judge, may be relevant to disqualification under [Canon] 3E."

A recent survey of active judges in four representative states reported a strong tendency by trial judges to disqualify on their own motion, and to disclose and disqualify on the motion of a party, if one party is represented by a *former* campaign treasurer of the judge, and a somewhat stronger tendency to recommend to a colleague to do so in like circumstances. Jeffrey M. Shaman & Jona Goldschmidt, *Judicial Disqualification: An Empirical Study of Judicial Practices and Attitudes,* Appendix A, 73, 76, and 83 (1995; published by The American Judicature Society, supported by the State Justice Institute). This study also reported that one state's advisory opinion has "held that Canon 3E(1) requires a judge to recuse himself or herself when a current campaign treasurer appears before the judge in court ... because the judge's impartiality might reasonably be questioned." *Id.* at 18.[2] While the study tells us "the requirement for recusal lessens with the passage of time as the question of the judge's impartiality becomes less of an issue," that comment doesn't directly affect this case. *Id.* at 18–19. Rather, here, we lack precise information on when and how Mr. Kloster and Dr. Larson joined Judge Hunke's campaign activities during the pendency of this case, whether before or after the occurrence of the trial.

We know, certainly, that Mr. Kloster and Dr. Larson's roles were publicly disclosed in a campaign ad for Judge Hunke within two weeks after the jury verdict. That so closely follows on the heels of the trial as to provoke serious factual questions, in my view. An overlap seems factually implicit, but not detailed, in Judge Hunke's acknowledgment that he "was well aware prior to the trial of the sensitivity involved in this issue ...," though the time and extent of the overlap is unclear.[3]

**2.** Shaman, et al., *Judicial Conduct and Ethics,* p. 343, elaborates:

> What happens when a member of an incumbent candidate's committee appears before the candidate as a litigant or attorney? Only one advisory opinion has explicitly addressed this question, holding that Code Canons 1 and 2, concerning the integrity of the judiciary and the appearance of judicial impropriety, mandate that an incumbent candidate disqualify himself or herself under Canon 3C when a lawyer-committee member appears in the candidate's court. This is considered to be necessary because the judge-candidate's impartiality might reasonably be questioned in those circumstances. Such a result is supported by ethics advisory opinions dealing with an analogous situation—where an attorney representing a judge in other litigation appears before the judge as a party or attorney for a party. In this situation, most jurisdictions take the view that the judge must disqualify himself or herself or at least disclose the relationship and continue to hear the case only upon the consent of all litigants and counsel.

**3.** Because there was no prior disclosure, there can be no remittal of disqualification in this case,

It is puzzling that Judge Hunke continued on the case after the verdict to decide the Reemses' 60(b) motion for relief when the circumstances were squarely submitted to him as disqualifying. This motion was unlike the general motions to disqualify Judge Hunke for bias before trial, which were based only on judicial rulings in the course of the case. Legal error in judicial rulings does not usually permit a challenge for bias because those errors are otherwise reviewable. *See Delzer v. United Bank of Bismarck*, 484 N.W.2d 502, 509 (N.D.1992) ("an isolated error of law does not automatically disqualify a trial judge as biased"); *Ex Parte American Steel Barrel Co.*, 230 U.S. 35, 44, 33 S.Ct. 1007, 1010, 57 L.Ed. 1379 (1913) (former statute on disqualification for bias "was never intended to enable a discontented litigant to oust a judge because of adverse rulings made, for such rulings are reviewable otherwise"). "Personal bias cannot be inferred from an adverse ruling." 46 AmJur2d *Judges* § 151; *see also id.* § 168. But the Reemses' 60(b) motion challenged a bias that clearly arose from an extrajudicial source, the judge's personal relationships with one party and with an attorney for another party during the trial. It is inexplicable why Judge Hunke failed to make a full disclosure on the record about the beginning, duration, and extent of those extrajudicial relationships before undertaking to rule on the Reemses' motion for 60(b) relief.

I agree with the majority opinion that the trial court acted within an acceptable range of discretion in deciding to exclude Beth Reems from the courtroom and in the instructions on proximate cause. Yet, I also believe that, if the trial judge had exercised his discretion in ways more favorable to Beth Reems, there would unlikely have been an abuse of discretion. "Generally, the disquali-

fication of a judge to hear and decide a case affects the judge's authority to act only in regard to discretionary matters in the case," and not for purely formal or ministerial acts. 46 AmJur2d *Judges* § 230 (1994). There can be little doubt here that Judge Hunke's role in this trial was more than formal or ministerial. And discretion does not justify a trial judge's undertaking to review his own undisclosed conduct in deciding the Reemses' 60(b)(vi) motion for relief from the verdict and the judgment. Without full disclosure and remittal, Judge Hunke was surely required to disqualify himself from deciding the very motion that seriously challenged his own decision not to disclose or to disqualify, since his impartiality was then reasonably questioned.

Resolution of this 60(b)(vi) motion, I believe, necessitates factual findings on the beginning, extent, and impact of Judge Hunke's campaign relationships with attorney Kloster and Dr. Larson during conduct of this case and the trial. A violation of Canon 3E(1), sufficient to cast doubt on the fairness of the trial, is established when a reasonable person, knowing all the relevant facts, would reasonably question the judge's impartiality. 46 AmJur2d *Judges* § 161 (1994). That determination should be made, in the first instance, by a new and unbiased judge, not the one whose conduct is challenged.

This approach has precedent in *Health Servs. Acquisition Corp. v. Liljeberg*, 796 F.2d 796, 798 (5th Cir.1986), summarizing its earlier unpublished opinion:

> While recognizing that there was no question as to the actual impartiality of Judge Collins, the court noted that "the judiciary must be governed by the appearance, as well as the reality, of disinterested adjudication." *Id.* The court therefore remanded the case to the district court for a

---

as authorized by the Code of Judicial Conduct. Canon 3F authorizes:

> Remittal of Disqualification. A judge disqualified by the terms of Section 3E may disclose on the record the basis of the judge's disqualification and may ask the parties and their lawyers to consider, *out of the presence of the judge,* whether to waive disqualification. If following disclosure of any basis for disqualification other than personal bias or prejudice

concerning a party, the parties and lawyers, *without participation by the judge,* all agree that the judge should not be disqualified, and the judge is then willing to participate, the judge may participate in the proceeding. The agreement shall be incorporated in the record of the proceeding.

(Emphasis supplied). The lack of disclosure, together with the Reemses' pre-trial motions to disqualify for bias, certainly foreclose any implied remittal in this case.

determination of when Judge Collins learned of Loyola's interest in the lawsuit. On remand, a hearing based solely on documentary evidence was held before another judge.

Affirmed sub. nom. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988) (appropriate remedy was to vacate trial court's judgment when reasonable person, knowing relevant facts, would expect that judge knew of circumstances creating appearance of partiality, notwithstanding finding that judge was not actually conscious of circumstances). Certainly, an unbiased decision on the Reemses' 60(b)(vi) motion is necessary.

I would reverse this order denying the 60(b)(vi) relief requested, and remand to a different judge for a hearing, appropriate findings, and a new decision on that motion. I subscribe to this view:

> Disputes arousing deep passions often come to the courtroom, and justice may appear imperfect to parties and their supporters disappointed by the outcome. This we cannot change. We can, however, enforce society's legitimate expectation that judges maintain, in fact and appearance, the conviction and discipline to resolve those disputes with detachment and impartiality.

*Liteky v. U.S.*, — U.S. —, —, 114 S.Ct. 1147, 1162, 127 L.Ed.2d 474 (1994) (Justice Kennedy, concurring). Because I would reverse and remand for reconsideration of the Reemses' 60(b) motion before a new judge, I respectfully dissent.